## Thunder Bay River Booming Company v. George Speechly and another.

*Navigable stream: Public highway.*   A stream which in its natural condition is capable of being used for important purposes of navigation must be regarded as a public highway.

*Streams navigable at times: High water: Public highways.* And if the stream is only navigable at certain seasons of the year, during periodical high stages of the water, it is to be considered a public highway at those seasons.

*Navigable streams: Floatage: Transporting logs: Highways.* These principles are applicable to a stream which is valuable to the public as a means of transporting the products of the forest by floatage to market, or to place of manufacture.

*Streams: Highways: Riparian proprietors: Dams: Floods: Floatage.* But a stream is not a public highway at those times when in its natural condition it cannot be used as such, nor has an upper riparian proprietor a right to make it such by detaining the water until a flood can be caused sufficient for floating logs, to the prejudice of a proprietor below.

*Booming companies: Dams: Floating logs: Riparian proprietors: Damages.* A booming company built a dam for the purpose of collecting the water of a stream periodically navigable, and sending it down in floods in the dry season, to enable the company to float logs which could not otherwise be floated at that season. A proprietor below was prevented in consequence from operating his mill for a considerable portion of the year:—

*Held*, That he was entitled to maintain an action therefor.

*Heard January 21 and 22. Decided February 26.*

Error to Alpena Circuit.

*Marston, Hatch & Cooley,* for plaintiff in error.

*A. McDonell,* for defendants in error.

COOLEY, J.

The defendants in error, plaintiffs below, are in the possession and use of a water-mill for the manufacture of lumber, situate on Thunder Bay river, and known as the Broadwell mill. The defendants below are in like possession and occupancy of what is called the Trowbridge mill, about three miles further up on the same stream. They appear to operate this mill for cutting lumber, but use the dam by which the power is obtained for the purpose mainly of accumulating water to facilitate their operations as a company for running, driving and booming logs. The declaration in the case, after reciting the facts of the occupancy and use of their mill by the plaintiffs, and of their right to an unrestricted flow of the water in the river for the purpose of operating the same, alleges that the defendants did, on the eleventh day of June, 1872, and on divers other days and times, between that day and the commencement of suit, wrongfully and injuriously raise and open certain flood gates in and attached to the Trowbridge mill-dam, and keep and continue the same open, and did attach to said dam, and on the top thereof, slash-boards and other contrivances for the purpose of stopping the water of said stream, and from thenceforth, during all the time aforesaid, unlawfully and wrongfully, stopped, diverted and turned large quantities of water of the said stream away from the plaintiff's saw-mill, and stopped, prevented and hindered the water of said stream from running or flowing in its usual course to said saw-mill, and from supplying the same with water for the necessary working thereof, whereby the plaintiffs for want of sufficient water could not during that time use their said saw-mill, or follow, use or exercise their calling or trade therein, in so large, extensive or beneficial a manner

31 MICH.—43.

as they might and otherwise would have done, but were thereby during all that time deprived of the use and enjoyment of their said mill, and of the benefits, profits, gains and advantages which they otherwise might and could have made in carrying on their trade and business therein.

On the trial it was shown that the Broadwell mill was constructed by Mrs. Broadwell in 1859, and operated by her every season until she sold to plaintiffs in the spring of 1872; that plaintiffs took possession and started up that spring, and ran the mill day and night, and had all the conveniences to continue to do so until they were prevented by the flooding by the defendants; that the mill property included Thunder Bay river in front as a part thereof; that the mill was capable of cutting from eight to twelve thousand feet of lumber every twelve hours, and was dependent on the river for power; that the dam belonging thereto created a pond eighty rods long and sixty rods wide, with a ten feet head, which would hold from one and a half to two million feet of logs; that the Trowbridge mill was built in 1861, and had more than one water-wheel; that it did not run nights in 1872, and only the small water-wheel was run in the day time; that plaintiffs, in the spring of 1872, entered into a contract with one Cicero, by which he was to furnish them with three million feet of logs, over the Trowbridge dam, in 1872; about one million feet of which was run into their pond in the spring; that plaintiffs were to take them at the Trowbridge dam, just over the same, run them to their mill pond, manufacture them into lumber, and deliver the lumber on a dock on Thunder Bay, about five miles distant; that their compensation was to be five dollars per thousand feet, and the whole cost of their labor would be about two dollars per thousand; that plaintiffs sawed about six hundred thousand feet under this contract, but were prevented from sawing the remainder, for the following reasons:

The Trowbridge dam was originally constructed in the usual manner of building dams attached to water-mills, with sluice ways and gates to allow the water of the stream to flow gradually and continuously. Defendants, in order to create floods, erected in June, 1872, three large flooding gates and two small ones, and a main sluice, with slash-boards abreast of the sluice, and planks set up endways, so as to cut off the whole flow of water with the exception of what went though the mill when running; these boards were put on for the purpose of detaining the water in the dam, and when removed, and the gates opened, the water ran down to plaintiffs' mill in such large quantities as to prevent their running the same, and after the head in the Trowbridge dam was thus run off, the gates shut down, and slash-boards put on, the flow of water would be shut off entirely, except what would pass through the Trowbridge mill through the flume, and that the effect upon plaintiffs' mill was to render it useless for want of water while thus shut off at the Trowbridge dam after using the supply of their own pond; and while the floods thus obtained lasted, the waters came down with so much velocity, and in such large quantities, as to throw the machinery of plaintiffs' mill out of order, and prevent their running their mill until the flood subsided. The supply of water in plaintiffs' dam, when the water above was shut off, would only operate their mill about two hours. Between the plaintiffs' mill and the Trowbridge mill are about three miles of rapids, upon which logs coming down in the spring of 1872 had jammed. The operations of defendants, as a booming company under the laws of the state, extend above and below the Trowbridge dam, excepting that portion of the river included in plaintiffs' premises. To get the logs thus jammed down the stream, the defendants commenced flooding by means of the Trowbridge dam, and in the manner above explained, on June 11th, 1872. The occasions and the effects of the flooding, and the intermediate periods of scarcity, were enumerated by witnesses, and evidence was

given that, on or about the 27th of August, Cicero, seeing
that plaintiffs, because of the hindrances aforesaid, would
be unable to perform their contract, took the logs remain-
ing in the pond, about four hundred thousand feet, and run
them down the river to other mills to be sawed, and
plaintiffs, after that date, had no logs to saw.   Plaintiffs
could have obtained logs, but it would have been useless
in consequence of the acts on the part of defendants, of
which they complain.   Until defendants commenced flood-
ing, plaintiffs run their mill night and day; they then as-
certained they could not run nights, but kept the night
men in their employ for several nights thereafter, remon-
strating meanwhile with defendants, and expecting and
hoping they would desist from their wrongful conduct.
They finally shut down their mill on the 26th of August,
but kept one force of seven men two or three days there-
after.

It further appeared that the quantity of logs run on
this river by defendants varied from thirty-six million feet
in 1868, to ninety-three million feet in 1873.   The evi-
dence of the plaintiffs was, that only a third or a fourth
of all was run during the spring freshets, and the reason
why more were not run at that time was, the want of
room in the river below the rapids, so that they had to
wait until room was made by sawing the logs first run;
and after the spring freshets they could only run logs by
flooding.   The defendants offered to show that there were
situated on Thunder Bay river, below the mill of the
plaintiffs, sixteen mills, having a cutting capacity of ninety
million feet of logs during the cutting season, which usu-
ally lasts about six months of the warm season; that these
mills represent a capital of one million five hundred thou-
sand dollars, and employ seven hundred and thirty-five
hands;   that they depend entirely upon logs run down
Thunder Bay river, for a supply to keep them running
during the sawing season; that the entire capacity of the
river below plaintiffs' mill, if filled, would not exceed thirty

million, and that no greater quantity could be run down the river, until after the water had subsided and room been made for them by sawing out those in the river; that this would take until June, and after that date logs cannot be run over the rapids without flooding in the manner practiced by defendants, which has now been kept up for ten years, and was practiced when plaintiffs bargained for their mill. This evidence was objected to and overruled.

This statement will be sufficient to show the bearing of the legal questions presented in the court below. That court was requested to charge the jury, that defendants had a right to use the water of the river to float logs, and if there was an insufficient supply to float logs during the months of June, July, and August, 1872, then defendants had a right to raise a head of water at the Trowbridge dam, to assist in running the logs on the rapids, and if they detained the water no longer than was necessary for the proper enjoyment of that right, then plaintiffs were not entitled to recover. This request was refused, and the court on the contrary instructed the jury, that the plaintiffs had a right as riparian proprietors, to have the water of the river flow into and through their pond in its usual and ordinary mode of flowing, and that any detention of water by defendants for the sole purpose of securing a flood, in such a manner that it could not be used by the plaintiffs in the operation of their mill, was unreasonable and unlawful as to them, and entitled them to compensation for the resulting damages. The jury returned a verdict for the plaintiffs.

The position taken by the defendants, and which they insist upon here, is, that Thunder Bay river is a public stream, navigable for the purpose of floating and booming logs, and that any rights of riparian proprietors are subservient to the right of the public to make use of the stream as a public highway; that defendants had a right to detain the water in the Trowbridge dam to assist in running the logs jammed upon the rapids, and that they could not be liable

for so doing, provided they detained the water no longer than was needful for that purpose, and exercised their right reasonably, with a due regard to the rights of others. And it is this claim which presents the principal question for our consideration.

That Thunder Bay river must be regarded as a public highway for the purpose of running logs, must be considered as determined by the previous adjudication of this court.— *Moore v. Sanborne, 2 Mich., 519.* But that case falls short of solving the difficulties presented by this, for, while that only determines that a stream may be public and navigable, which is capable of being used for floating logs for a considerable portion of the year, the question presented by this is, whether such a stream is to be considered navigable and subject to the public easement at a time when, in its natural condition, it is entirely incapable of being made use of, even for the restricted navigation which was held to be of common right in the case referred to. There is obviously a very broad distinction between a stream being held to be public and navigable while it is capable of being used by the public for any important purpose of carriage by water, and the same stream being held to be so when the whole capacity for use is created by artificial means, and by abridging what, but for the resort to these artificial means, would be the unquestionable rights of riparian proprietors on the stream below.

None of the adjudications cover the precise question here involved. In Maine, where the right to float logs in such streams as are suitable is so important, the same general doctrine which was accepted and declared in *Moore v. Sanborne* has been repeatedly acted upon.—*Brown v. Chadbourne, 31 Me., 9 ; Treat v. Lord, 42 Me., 552 ;* and see *Veazie v. Dwinel, 50 Me., 484; Gerrish v. Brown, 51 Me., 256 ; Davis v. Winslow, 51 Me., 297.* The New York court of appeals, accepting and following this doctrine, state it thus: " The true rule is, that the public have a right of way in every stream which is capable, in its natural state and its ordinary vol-

ume of water, of transporting, in a condition fit for market, the product of the forests, or mines, or of the tillage of the soil upon its banks. It is not essential to the right, that the property to be transported should be carried in vessels, or in some other mode whereby it can be guided by the agency of man, provided it can ordinarily be carried safely without such guidance. Nor is it necessary that the stream should be capable of being thus navigated against its current, as well as in the direction of its current. If it is so far navigable or floatable, *in its natural state and its ordinary capacity,* as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported. Nor is it essential to the easement, that the capacity of the stream, as above defined, should be continuous, or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is *ordinarily* subject to periodical fluctuations in the volume and height of its water, *attributable to natural causes, and recurring as regularly as the seasons,* and if its periods of high water and navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement."—*Morgan v. King, 35 N. Y., 459.* See also same case in the supreme court.—*18 Barb., 284, and 30 Barb., 9 ; Shaw v. Crawford, 10 Johns., 236 ; Weise v. Smith, 3 Oregon, 445 ; S. C., 8 Am. Rep., 621.* No case goes further than these, and they carefully restrict the public easement within the bounds of a capability for use in the ordinary and natural condition of the water course. The possibility of occasional use during unusual and brief freshets certainly could not make a stream a public highway. It is so held in *Hubbard v. Bell, 54 Ill., 110,* a case which unnecessarily criticises the Maine and Michigan cases as exceptional, though they may well stand with that upon its facts.

The doctrine, then, which we derive from the cases is, that a stream may be a public highway for floatage when it is capable in its ordinary and natural stage in the seasons of high water of valuable public use. The inference sought

to be drawn from it is, that a navigable stream must, in contemplation of law, be navigable at all times, and under all circumstances; that there can be no such thing as a highway which is only open to the public use periodically, but that when once the public character of the way is established, the right of the public to the easement is paramount to all private rights, and that nothing done to facilitate the public use can be the foundation of a right of action unless in itself unreasonable, when the due subordination of private to public rights in the stream is considered and properly allowed for. But no such inference is warranted by the decisions. The highway they recognize is one *sui generis,* and in which the public rights spring from peculiar facts. It is a public highway by nature, but one which is such only periodically, and while the natural condition permits of a public use. During that time the public right of floatage and the private right of the riparian proprietors must each be exercised with due consideration for the other, and any injury which the latter receives in consequence of a proper use of the stream for floatage he must submit to as incident to his situation upon navigable waters.—*Middleton v. Booming Company,* 27 *Mich.,* 533. But at periods when there is no highway at all, there is no ground for asserting a right to create a highway by means which appropriate or destroy private rights. The doctrine that this may be done without compensation to parties injured, is at war with all our ideas of property and of constitutional rights. The most that can be said of this stream, during the seasons of low water, is, that it is capable of being made occasionally navigable by appropriating for the purpose the water to the natural flow of which the riparian proprietors are entitled. It is highly probable, in view of the large interests which are concerned in the floatage, that the general public good would be subserved by so doing, but this fact can have no bearing upon the legal question. It is often the case that the public good would be subserved by forcing a public way through private possessions, but it neither should be nor can be

done under any circumstances without observing the only condition on which it can be permitted in constitutional government, namely, that the private proprietor be compensated for the value which he surrenders to the public. We do not question the right of the legislature to provide for the taking of riparian rights for this purpose, but no attempt has been made in this case to resort to a legal appropriation, and the reliance of the booming company is exclusively upon a public right of navigation, though the capacity for navigation does not exist by nature, is only created by artificial means, and can neither be created nor enjoyed without appropriating to the use of the company the valuable riparian rights which the plaintiffs acquired by the purchase of lands over which the stream runs; this appropriation without compensation is no more admissible than would be the taking of land for an ordinary highway or a railroad. As was remarked in *Morgan v. King, 35 N. Y., 460,* the question of public right in a case like this is to be decided without reference to the effect which artificial improvements have had in the navigable capacity of the river; in other words, the public right is measured by the capacity of the stream for valuable public use in its natural condition; and any attempt to create capacity at other times at the expense of private interests can be justified only on an assessment and payment of compensation.

Our conclusion is that the judge did not err on the principal point in the case. It was argued that he erroneously permitted the plaintiffs to recover for the wages of laborers kept in their employ for a few days after the acts of the defendants rendered the use of their mill impracticable. But it does not appear that they retained these laborers an unreasonable time while they were endeavoring to induce the defendants to desist from their injurious acts.

The judgment must be affirmed, with costs.

GRAVES, CH. J., and CAMPBELL, J., concurred.

CHRISTIANCY, J., did not sit in this case.