GRAND TRUNK RY. Co. *et al. v.* A. BACKUS, Jr., & SONS *et al.*

*(Circuit Court, E. D. Michigan.  May 15, 1891.)*

1. HARBORS—UNLAWFUL EXTENSION OF DOCKS—INJUNCTION.
      Act Cong. Sept. 19, 1890, § 7, provides that it shall be unlawful to build a wharf outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, in such manner as to impair navigation, without the permission of the secretary of war. *Held,* that a preliminary injunction will be granted against the extension, without the consent of the secretary of war, of a dock 25 feet into a navigable river, to a point where the depth is from 26 to 28 feet, when such extension will seriously injure the commerce of an adjoining ferry company.

2. SAME.
      The fact that a dock extends to a certain point in a river is no ground for not enjoining the extension of an adjacent dock to that point, when such extension is unlawful.

In Equity.

*Alfred Russell*, for complainants.
*Don M. Dickinson*, for defendants.

JACKSON, J., (*orally*). The court has considered the application for a temporary injunction in the case of the Grand Trunk Railway Company and the Wabash Railroad Company and the Canadian Pacific Railway against A. Backus & Sons, a corporation, and Absalom Backus, Jr. It is shown by the bill that the complainants are corporations of the Dominion of Canada and of the state of Missouri; that they are lessees and licensees of the Detroit Union Railroad Depot & Station Company; that they are engaged in interstate commerce traffic; that transfers are made from the Canadian side of the river to the Michigan side by three large steamers,—the Landsdowne, being 313 feet in length, and about 72 feet in width, making 18 trips a day, and carrying some 16 freight-cars and 10 passenger-cars at each trip,—and that these vessels, so making transfers for these companies, and doing an interstate commerce business from east to west, pass into the slip of the Detroit Union Railroad Depot & Station Company, of which they are licensees and lessees, and that that ferry-slip is necessary to the transaction of their business, and that the defendants Backus, Jr., & Sons, propose to extend a wharf in front of their adjoining property out into the river a distance, as charged in the bill, of 50 feet from its present front. The complainants allege that such extension would greatly impede their ingress to and egress from the ferry-slip they are using; that it would constitute a public nuisance, and an encroachment upon the navigable water of the river, and would entail upon them irreparable injury, and a serious interference with their business; and they seek, therefore, upon the ground that its erection would constitute a public nuisance, and that it would entail special damage upon them, to restrain defendants from proceeding to make such extension of their wharf or dock. The defendants answer, and deny that they propose to extend their dock 50 feet out into the river, and say they only propose to extend it 25 feet, and their affidavits support their answer on that point. They also claim that as the complainants now use their transfer boats, the Landsdowne, the Ontario, and Great Western, they are in fact appropriating defendants' land, inasmuch as those vessels when in the ferry-slip extend rearwards or backwards so as to cover some 25 feet of defendants' front, which they claim is private property, and deny the right of complainants to so use their private property. Various affidavits have been filed on each side.

No question is seriously made as to the equity of the bill, if the facts therein stated are substantially true, and no point can be made on the right of these complainants to seek for an injunction, and obtain it, if a public nuisance is being erected, which public nuisance will entail upon them serious special damage, or a serious interruption to their business. Before considering the affidavits and the points raised by the defendants, the court may make a few general observations:

1. It is not questioned, and cannot be, that the Detroit river is one of the navigable streams of the United States, which congress, under the

commercial clause of the constitution, has a paramount right and authority to regulate and control.

2. Until congress exercises its superior right of control over public water highways, it is certain that the state bordering thereon, or within the limits of which such navigable waters are located, may directly, or through the instrumentality of its municipalities, regulate the erection of wharves and docks and like structures therein, and also define the channel bank or line of navigability. In the absence of regulations by congress or the state or local authorities, it is also settled that the riparian proprietor or adjacent owner of land bordering upon such waters may erect for himself, or for the use of the public, docks and wharves in such waters, out to the line of their navigability.

In *Dutton* v. *Strong*, 1 Black, 132, where the subject was discussed as to the rights of the riparian owner upon our inland waters, the court says:

"Wherever the water of the shore is too shoal to be navigable, there is certainly the same necessity for such erections [wharves and docks] in such internal waters as in bays and arms of the sea; and, where that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it, but the right must be understood as terminating at the point of navigability. If the riparian proprietor extends his docks, wharves, or other structures beyond the line of navigability, so as to obstruct or in any wise impede the navigation of the public water highway or stream over which the right of the public is paramount, he creates a public nuisance, which persons specially injured thereby are entitled to abate or enjoin."

Again, it is settled by the authorities, and I am not going to take time to refer to them, that state action or non-action in reference to the navigable waters of the United States in no way affects or restricts the right of congress to exercise its paramount authority, and supersede whatever has been sanctioned or permitted by local authority; because acts of congress upon subjects within the jurisdiction of the general government, such as are covered by the commercial clause of the constitution, are necessarily the paramount law of this country. Non-action by congress as to such matters of local character and operation is deemed a declaration that for the time being, and until congress sees fit to otherwise order, they may be regulated by state authority. The state authority of Michigan has in fact made no regulation upon this subject in respect to the Detroit river. In 1883, in rechartering the city of Detroit, it conferred upon the city the authority to fix and define and prescribe the harbor lines, and to define the points in the river beyond which these structures should not be extended. The city of Detroit exercised that authority. The defendants in this case therefore stand alone upon their rights as riparian proprietors, which they insist give them the right to extend their present dock frontage 25 feet out into the river. In extending it out that distance into the river, they will reach a depth of 26 and a fraction feet, or an average mean depth of between 26 and 28 feet, as shown by the soundings and affidavits of a disinterested party, Mr. Ferguson, the assistant engineer of the city. The commerce clause or provision of the constitution includes control of the navigable waters of

the United States so far as may be necessary to insure free navigation; and by navigable waters of the United States is meant such as are navigable in fact, and which by themselves, or by their connections with other waters, form a continuous channel for commerce with foreign countries or among the states.

In case of *The Daniel Ball*, 10 Wall. 557, this question of navigability, which forms the very essence of navigable water, is clearly and fully discussed, and they say in that case as to the test:

"A different test must therefore be applied to determine the navigability of our rivers, and that is found in their navigable capacity Those rivers must be regarded as public navigable rivers in law which are navigable in fact; and they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

That constitutes its navigability, and must necessarily define the line or point to which navigability must extend. The case of *The Daniel Ball* has been repeatedly affirmed in various cases. I call attention to *Escanaba, etc., Co.* v. *City of Chicago*, 107 U. S. 678, 2 Sup. Ct. Rep. 185. It was also affirmed in *Miller* v. *Mayor*, 109 U. S. 385, 3 Sup. Ct. Rep. 228, and, in *Booming Co.* v. *Speechly*, 31 Mich. 336, Judge COOLEY, delivering the opinion of the supreme court of this state, announces substantially the same rule in determining that question. In *Atlee* v. *Packet Co.*, 21 Wall. 389, the adjacent owner, without express authority of law from the state or from any municipal authority, extended his pier out into the Mississippi river, to a point where the water was 12 feet deep. It was held that the packet company whose boat struck the pier had a right of action against him for damages, because the structure was an unlawful one, and because it extended into navigable waters. It is true that in that case, under the admiralty rule, the packet company having brought its suit in the admiralty court, the court divided the damages, on the ground that the packet company in the navigation of its boat was also guilty of negligence, but, if the suit had been at law, the packet company would have recovered full damages. Take a case in connection with the navigability of the water in front of the defendants' present wharf. Could not a vessel of 20 tons burden and upwards navigate in front of the present wharf? Suppose a collision were to occur between the present front of the defendants' wharf and the front of the proposed extension, within the 25 feet, or within 10 feet of defendants' present front, could there be any doubt that the district court of the United States would have jurisdiction over that collision? It could not, unless they were navigable waters. Take the Michigan statute upon the subject of vessels of five tons burden and upwards. It is manifest that these vessels, and such as ordinarily navigate this stream, can pass in front of defendants' wharf as it now stands. The Landsdowne itself, with a capacity of 1,500 tons, and carrying these immense freight and passenger trains, draws 8 feet 4 inches, and can pass readily along in front of the existing dock-line of these premises. In

1873 the canal or channel through the St. Clair flats was only 13 feet in depth; now its regular depth is 16 feet.   Sixteen feet, as shown by the government chart, as well as stated by the local engineer in charge, Gen. Poe, constitutes the present depth of the controlling channels for all this water highway navigation.   It therefore cannot be true, as counsel for the defendants have contended, that the line of navigability in front of the city of Detroit ranges from 20 to 25 feet.   If we were to make and define that as the line of navigability, we would practically and absolutely treat as worthless and unworthy of consideration the fact that the government in making the artificial channels only provides for or requires 16 feet.   It would not do, therefore, to say, while the government provides 13, 14, and 16 feet as sufficient depth to accommodate the navigation of the vessels that traverse these waters, that the court should hold or find as a fact that 20 feet is necessary, or 23 is necessary, in the frontage of the city of Detroit.   That would be wholly and utterly inconsistent.

The defendants have called the attention of the court to the government chart of the Detroit river, and on the margin of the chart is a statement explanatory thereof, to this effect: "The dotted surfaces and dotted curves represent, respectively, six, twelve, and eighteen feet, and serve to show the limits of navigation."   Those dotted lines, running out from the shore at 6, 12, and 18 feet, respectively, were never intended to define the line of navigability, or the harbor line or channel bank.   What they are intended to define and indicate and mean is simply this: that a vessel drawing 6 feet of water may go to that inner dotted line; that a vessel drawing or requiring 12 feet of water may go to that second dotted line with safety; and that one drawing 18 feet would be safe in going to that outer dotted line in a depth of 18 feet,—and it does not indicate anything more, and it never was so intended.   So nothing can be gained from a reference to that chart.

But the right of the defendants in this case to build this structure is absolutely prohibited by the act of congress approved September 19, 1890, which was the first time congress took upon itself the exercise of its authority to legislate upon this subject.   That legislation is paramount and controlling, and, even if this proposed extension had been under express legislative authority, it would have to give way before the act of congress of September 19, 1890.   That act I shall refer to for a moment, because it has important bearing in this and other similar cases.   By the seventh section of that act it is provided—

"That it shall not be lawful to build any wharf, pier, etc., or structure of any kind, outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the secretary of war, in any port, roadstead, haven, navigable water or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters; and it shall not be lawful hereafter to commence the construction of any bridge, bridge-draw, bridge-piers, and abutments, causeway, or other works over or in any port, road, roadstead, haven, harbor, navigable water or navigable waters of the United States, under any act of the legislative assembly of any state, until the location and plan of such bridge or other works have been submitted to

and approved by the secretary of war, or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, the channel of said navigable water of the United States, unless approved and authorized by the secretary of war: provided, that this section shall not apply to any bridge, bridge-draw, bridge-piers, and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, draw-bridge, bridge-piers, and abutments, or other works, under an act of the legislature of any state, over or in any stream, port, road, roadstead, haven, or harbor, or other navigable water not wholly within the limits of such state."

The reason for adding that clause, "other navigable water not wholly within the limits of such state," was that line of decisions in the supreme court of the United States holding that, where the navigable water was located or lay wholly within the limits of a state, the state could, by legislative authority, permit or allow bridges or other structures to be erected entirely across them, and regulate the passage of vessels through the same. The tenth section is as follows: "That the creation of any obstruction not affirmatively authorized by law to the navigable capacity of any waters, in respect of which the United States has jurisdiction, is hereby prohibited,"—and to construct it or continue it is made a misdemeanor, punishable by a heavy fine or imprisonment, or both, in the discretion of the court. This structure, therefore, cannot be lawfully extended by the defendants. If extended it would be an unlawful structure, for which they would be subject to indictment and to imprisonment or fine, or both. It would extend into the waters to a depth, if erected, which would make it a public nuisance. That it will interfere with these complainants is perfectly manifest. That it will work ruinous injury to them, and the commerce they are carrying on, is manifest.

It is urged as a matter of equity for the defense that on the property west of them and adjoining them, owned by James F. Joy, and occupied by Mr. Letts, the wharf extends out to a depth about which they differ; the defendants saying it is 22 feet, and the city engineer fixing it at 19 and 20,—19 at the western end and 20 at the eastern. But, whatever depth it may have, it cannot be assumed that, because they go to that depth, the defendants have the right to come out to a line corresponding as a direct line, without reference to the depth of the water. It does not follow, if the fact be so, that Letts or Joy extended their dock so as to encroach upon the navigability of the river, that this defendant has the right to do so. If they are creating a public nuisance, they are liable to the people who are damaged by it, and, having done it without authority of the state or city, they may be creating and maintaining at that point a public nuisance. But that does not meet this question. It may be that they are subject to indictment for the continuance of that structure, and to penalty, but that has nothing to do with the question before the court. It is wholly immaterial. What will be the consequence and what is the present working of the system under which the defendants claim the right to go out to a line, without reference to depth of water, which will correspond with other docks belonging either to themselves or others? When they reach their 25 feet, the next man will want to

come to that, and his neighbor will want to come to that corresponding line, and thus the navigable waters of the shores will be steadily encroached upon. Already the frontage of the river has, by an attempt to acquire land and to secure additional property, and to secure greater facilities, been encroached upon all along the city front, running out to various depths that are not warranted by law, and constituting encroachments upon the navigable waters of the river. Because others are doing this, that does not confer upon the defendants the right to do it.

In reference to the complainants' slip, the slip of the Union Railroad Depot & Station Company, there is nothing to show the wharf line there, or whether or not they are trespassing upon public waters. It is stated that on their grounds they can get a depth of from 20 to 23 feet of water. The affidavits show that in the slip they are now using there is a depth of from 14 to 16 feet. However that may be, it is perfectly clear to the court that this extension by defendants will encroach upon the navigable waters of the river, and that it will constitute a public nuisance, and that it will work irreparable injury to the complainants in the use of their boats, and it must therefore be declared unlawful, and be restrained.

It is said by the defendants that it is an appropriation of their property to occupy this frontage. Certainly the complainants have no right to appropriate defendants' property. If the water in front of their present dock does not constitute public water over which the complainants have the right to navigate, of course they can enjoin or restrain them, but, as the court believes these waters are public waters, the complainants' boats have the right to cross them in the usual way, and enter their slip in the only practicable way in which they can enter, and this would be defeated if the defendants' proposed structure were erected. The court will grant the preliminary injunction in this case.

*Mr. Dickinson.* I desire to say a word. I wish to ask for a rehearing before your honor, or before a full bench. It will be universally conceded that on this great water-way this decision is of very great importance. As we understand the decision of the court, the line of navigability must be limited to the depth at which 20 ton vessels can approach, and that, therefore, the line of navigability in front of the city of Detroit may be as low as 6 feet. It is of very great importance, for the reason that the dock-line—and your honor misapprehended the statement of the defendants as intending to state that as the line of navigability—the dock-line in front of the city of Detroit, as it was intended to be stated is at a minimum depth of 20 feet throughout the length of the front of the city of Detroit; and, of course, if your honor's holding shall be sustained on a fuller review of the case by your honor, then any dock proprietor along the entire front of the city may be indicted for maintaining a public nuisance.

*Court.* I called attention to that in connection with future erections. I did not intend to pass upon that question.

*Mr. Dickinson.* There are continually new docks going up as the city grows. To show your honor the importance of this matter, and the

need of a fuller hearing than we can get upon a motion for an injunction, and a thorough understanding of the facts, let me say that, while the front of the real estate upon the street immediately contiguous to this property may be worth $25 or $50 a foot, the front upon the river is worth from $500 to $1,000 per foot, so we may say that this 60 feet front which it is sought to extend is of the value to-day of $60,000, and its value is solely due because of the rights the defendants have to reach it from the river by navigation like their neighbors. That property by this decision would be rendered utterly worthless, because it is in a cove by itself, and could not be reached by reason of the projection of another dock 25 feet beyond it. No ship could get into his 60 feet, and if he should attempt to sell that which was ordinarily worth $1,000 a foot, he would of course be unable to realize a dollar for it, because no ship could reach it. For these reasons, and because of the very great importance of your honor's decision, and because we apprehend on a fuller hearing your honor will decide that the line of navigability is not where a 20-ton ship would come, but the line of navigability is where ships of ordinary tonnage would come, we would ask for a rehearing. If your honor should fix the line of navigability where your honor does, where a ship of 20 or 30 tons would come, then it must be true that Detroit, throughout its whole water-front, must have a system of lighterage, because vessels cannot reach the docks.

*Court.* How do they get through the channels?

*Mr. Dickinson.* Gen. Poe is simply mistaken. Sixteen-foot ships come through the St. Clair flats, and no one for a moment will contend that a vessel drawing 16 feet could navigate in 16 feet of water, because the vessel would drag upon the bottom. However that may be, if it be true that the line of navigation must be fixed at a point where 20, 25, 30, and 50 ton ships can go, then Detroit on its whole front must, as ships bring freight and passengers, if the vessels draw more than that, have a system of lighterage to get out of the river.

*Court.* The decision is an important one, and I will hear you fully at any time when the court has opportunity, either by oral argument or by briefs; and the court does not now undertake to establish the line of navigability. Under the act of September 19, 1890, that matter is left to the secretary of war, and an application ought now to be made to the secretary of war to define the line of navigability of the Detroit river; otherwise, litigation will grow and be interminable on this question.

*Mr. Dickinson.* I would suggest to your honor that there is 60 feet front that is utterly worthless if your honor's decision shall stand, and I would suggest whether it would not be better, pending the hearing, that these gentlemen should file a bond to respond in damages if it should be subsequently determined liable for such damages?

*Court.* I will impose upon them the obligation of giving you a bond of $25,000 to abide the result of this suit. If a bond is desired, I will require a bond in event the court may be mistaken. The bond would only cover damage resulting during the litigation, and these parties are amply able to give a bond of $25,000 to indemnify you.

*Mr. Russell.* We have no objection to giving such a bond. If my friend desires speed in the matter on account of great suffering, and because vessels drawing 11 feet of water desire to get there, and cannot, I will file a replication to-day to his answer, and I will go to hearing in pen court with witnesses at once.

*Mr. Dickinson.* We accept the suggestion, but, as we have all the material ready to make the extension to this dock, we desire the bond.

*Court.* Execute the bond. That is all the court can do now.

*Mr. Russell.* We will ask for costs upon the motion for prelminary injunction.

*Court.* I will let that abide the determination of the question.