### NEELY *v.* DETROIT SUGAR CO.

1. Trial—Instructions—Argument.
   An instruction that the jury ought to discard all those statements of counsel that might perhaps result in influencing them, or possibly might have been designed to influence them, *held* not objectionable when considered with the rest of the charge.

2. Watercourses—Obstruction — Riparian Rights — Injury to Fee.
   Where plaintiff was in possession under a land contract from W., who more than 30 years before had obtained deeds to the property, and who, with plaintiff, had been in continuous possession for that period, and who had assigned to plaintiff any cause of action he might have, plaintiff was entitled to any damages to the fee by reason of the obstruction of his mill pond and race thereon.

3. Lands—Sale—Oral Proof.
   Where, in an action for damages to a mill pond and race, defendant's witness stated that he at one time owned the mill

property, a statement elicited on cross-examination that he had sold to a certain party, under whom plaintiff claimed, was not objectionable as an admission of oral proof of sale.

4. WATERCOURSES—OBSTRUCTION—DAMAGES—INSTRUCTIONS.

In an action for damages to plaintiff's mill pond and race by obstruction of the steam, an instruction that, if the plaintiff used the creek above the mill in a certain manner, then such user "would be an unreasonable use thereof, and would render it liable in this action to the plaintiff for the damages it has occasioned him, if any," was not, when read with the rest of the charge, subject to the objection that it permitted a recovery for "all the damages it has occasioned him," whether or not resulting from an unreasonable use.

5. SAME—RAISING QUESTION.

In an action for damages to mill property by obstructing the creek by depositing refuse therein, in which it was claimed that the injury had continued for three or four years, a witness for plaintiff was asked if he was acquainted with the fair rental value prior to the time suit was instituted, and what that value was. Defendant objected that the question "should be confined to the rental value during the time that the mill has been shown to have been idle, and this is incompetent and immaterial." *Held*, that this did not suggest that defendant was claiming that the plaintiff ought, as soon as practicable, to remove the deposit, and that the failure to do so affected the measure of recovery, and therefore the question could not be raised on appeal.

Error to Oakland; Smith, J. Submitted November 17, 1904. (Docket No. 109.) Decided December 14, 1904.

Case by Thomas Neely against the Detroit Sugar Company for damages caused by the obstruction of a mill pond. There was judgment for plaintiff, and defendant brings error. Affirmed.

*H. H. Hatch*, for appellant.

*Davis & Bromley*, for appellee.

MOORE, C. J. This is an action brought by the plaintiff to recover damages. The plaintiff claimed to be in possession of a flouring mill situated in the village of Roch-

ester, on Paint creek. The mill was operated by water power, and connected with it was a raceway and a small pond, of about two acres in extent. Upstream from the plaintiff's pond, and adjoining his pond, was located a tract of land owned by the defendant, the Detroit Sugar Company. In the year 1899 the defendant erected on its land a factory for the manufacture of sugar from beets. It used the water of Paint creek in the factory, taking the water from a small dam that extended across the creek above the factory. The drainage from the factory led into Paint creek above the pond of the plaintiff.

The claim of the plaintiff was that the defendant had caused to be discharged into the creek beets, beet tops, and other refuse from its factory, and also mud more or less mixed with lime; that, after the first season's operation of the defendant's factory, these beets, beet tops, and other refuse floated downstream and obstructed the flow of water to the plaintiff's mill wheel; that, after the second season's operation of the defendant's factory, plaintiff's pond and race were partially filled by the discharge of mud and lime therefrom. A season's operation of the sugar factory is generally referred to as a "campaign."

The defendant's sugar factory was completed in the fall of 1899, and its first campaign began on the 2d day of November and continued until the 30th day of December of that year. The next campaign began on the 18th day of October, 1900, and ended on the 30th day of December of that year. The next campaign began on the 9th day of October, 1901, and continued until the 28th day of December of that year. This suit was commenced on the 16th day of July, 1902. The case was tried before a jury. From a judgment in favor of plaintiff, the case is brought here by writ of error.

The record contains nearly 150 pages. The jury were also taken to view the premises. In the bill of exceptions it is said a large amount of testimony was introduced by both parties not set forth in the bill of exceptions.

A reading of the charge made by the trial judge will

greatly aid in understanding the errors which are discussed by counsel.  The charge is as follows:

" Counsel of great ability and learning have spent six hours in arguing this case to you and setting forth the claims of their respective clients, and that makes it unnecessary for me to spend any length of time in reviewing the facts claimed in this case.  Briefly stated, Mr. Neely and the Wilsons claim to be in possession of a mill and mill privilege and water power, and that the water privilege has been in use by them and their grantors a long time, and that the sugar-mill factory was built at a comparatively late period (in 1899, if I recollect the date); and it is the claim of the plaintiff that the sugar company have caused or allowed such amounts of dirt, lime, sediment, or lime mud, beets, and beet tops, to be deposited in the creek, and that they have been conveyed by Paint creek to the pond in question in such an unreasonable amount thereof as to have greatly injured the power furnished by the mill pond and Paint creek, and it is his claim that he is entitled by reason thereof to the loss of the rental value that has been occasioned to a large amount, and that he is entitled to recover the costs of removing the deposits of lime mud, dirt, and sediment, and which he also claims would be very large.

" The claim on the part of the defendant, briefly stated, is that the pond in question furnishes but very little addition to his water supply; that it has not been filled up to any material or appreciable extent, unless by natural causes, and that there has been no use of the creek as a deposit for sediment, lime, or mud, or the refuse from the factory, to any unreasonable amount, in this creek, at all, and that even if deposits of sediment have been conveyed from the factory to the pond in question, and along the raceway onto the plaintiff's premises, still that there is a more practical way of removing it than that claimed by the plaintiff.  The claim by the plaintiff is that it must be removed by hand power—that is, by shoveling and by use of wheelbarrows—while the claim of the defendant is that, by cutting or making an opening into the dam, it can be flushed out by the force of the stream, by the water itself, at a small expense.

" Now, all of the other claims principally growing out of these circumstances, and all this evidence, tend to support one or the other of these principal claims which are pre-

sented to you. Now, to sustain the plaintiff's claim, he must prove all parts of his claim, or, more correctly speaking, he must prove each one of his various claims that are material to the issue, by a fair preponderance of evidence. It is not for the defendant to disprove the claims of the plaintiff, but it is for the plaintiff to first prove his claim. The burden of proof is upon him to establish the various claims, let me repeat, by a fair preponderance of evidence; and by that term is meant such evidence as, when weighed with that which is offered to oppose it, has more convincing power in the minds of the jury. It is not a technical term at all, but means simply that evidence which outweighs that which is offered to oppose it. It does not mean necessarily that a greater number of witnesses shall be produced on the one side or the other, but that on the whole evidence the jury believe the greater probability of the truth to be on the side of the party having the affirmative of the issue, and in this case the affirmative of the issue is with the plaintiff.

"The legal claims are so thoroughly and completely covered by these requests which have been handed up that it will not be necessary for me to indulge at length in any general charge at all. There is nothing that I can say that would be anything more than a repetition of the language that is contained in these requests; and such of them as I read you, gentlemen, will be considered as good law and the charge of the court, and those that I omit will not have any bearing on the case at all, even if you did hear them read by counsel.

"On the part of the plaintiff I charge you, first, if the jury find from the evidence in this case that at the time of the commencement of this suit the plaintiff, Thomas Neely, was in the open and peaceable possession of the milling property mentioned in the declaration in this case, under a land contract for the purchase of the same from the Wilsons, and that they had, previous to the commencement of this suit, sold, assigned, and transferred to the plaintiff all their right, title, and interest in and to any and all of their claim for damages against the defendant, then such facts would constitute the plaintiff a sufficient owner of the said milling property to commence and maintain this suit.

"*Second.* If the jury find from the evidence in this case that at the time of the commencement of this suit, and for fifteen years and more prior thereto, there had been kept

up and maintained a water power and a dam at a certain height on the property described in the declaration, by the plaintiff or the parties from whom he claims, then the plaintiff would have the right at this time to keep up and maintain the said dam at said height, and would be the owner thereof, the same as though he had a deed or deeds of the same.

" *Third.* If the jury find from the evidence in this case that said dam so maintained backed the waters of Paint creek over and upon the lands of the defendant, or the persons from whom it claims, for fifteen years or more prior to July 16, 1902, then the defendant would have no right to fill up the pond or reservoir so formed, so as to diminish or destroy the capacity thereof, to the injury of the plaintiff. Now, gentlemen, the latter part of this request contains some language that perhaps ought not to be there as a part of the request itself. It does not refer to the merits of this case particularly, but refers to the question of the extent of the dam, and whether or not there should be any deduction from the fact that it is the claim that a part of this waterway and dam extends over onto the premises of the defendant. The charge that will govern the merits of the case is not contained in the latter part of this request, but will be given you later.

" The fourth and fifth requests contain what I give you, or that will govern the plaintiff's case, and what will enable him to recover, if he recovers at all, and those requests are as follows (and I might say that any language that may have been contained in the latter part of the request just read that is in contradiction to this is put there by a mere inadvertence, and will not govern you):

" If the jury find from the evidence in this case that the defendant, the Detroit Sugar Company, its agents or servants, during the campaigns (so called) of said company from November 1, 1899, to July 16, 1902, have deposited into Paint creek, and from thence into the pond, race, flume, and water wheel, of the water power and mill of the plaintiff, such quantities of beets, tops of beets, beet roots, lime mud, lime, sand, and dirt, and other refuse from its sugar plant, as to materially and unreasonably lessen, diminish, injure, and damage such pond, race, and mill property, then such use and such acts of the defendant with the said waters of Paint creek would be an unreasonable use thereof, and would render it liable in this action to the plaintiff for the damages it has occasioned him, if any.

"The court instructs the jury that the plaintiff, Thomas Neely, at the time of the commencement of this suit, and from November 1, 1899, was entitled to the use of the old pond (so called) and his race in the same manner as before November 1, 1899, and was entitled thereto free from any material amount of refuse and pollution therein, except the amount that would naturally come therein; and if the defendant, its agents or servants, during said time, in the conduct of business, so used the waters of Paint creek as to deposit therein at or near its sugar plant, and the flow of said creek carried into the old pond and race of the plaintiff, such quantities of beets, tops of beets, beet roots, lime mud, sand, and dirt, and other refuse, as to materially and unreasonably lessen and diminish the quantity of water therein, and thereby injure, lessen, diminish, and damage the capacity, power, and operation of plaintiff's flour and feed mill, then such acts of depositing into and such user of said stream by the defendant was and would be an unreasonable use and user thereof, and would render it liable in this action to the plaintiff for the damages it has occasioned him, if any.

"I charge you further, that, in estimating the damage of the plaintiff, the jury are not to consider the question of whether the defendant company are making money or not, or the result upon the company—whether they will remove their plant, or not, if a judgment is rendered against them. I have already indicated to you, in accordance with the statement of counsel, that that question has no place whatever in the case.

"On the part of the defendant I give you a portion of the requests. The first eight requests, relating to the various technical questions, to my mind do not affect the real merits of this controversy, and so they are for that reason refused.

"I give you the requests as follows, beginning with the ninth: That the defendant, as a riparian proprietor upon Paint creek, has an equal right with all other riparian proprietors on said stream in the use of the waters thereof, and such right of the defendant may operate to qualify the rights of all such other riparian proprietors on said stream. And by 'riparian proprietors,' gentlemen, is meant other owners of property along the stream which require the use of the waters thereof. A fair participation in and a reasonable use by each riparian proprietor on the said Paint creek of the waters thereof is what the law seeks to protect, and an injury that is incidental to a

reasonable enjoyment by one of such riparian proprietors of the right common to all cannot be complained of, or made the foundation of recovery.

"The question of what is a reasonable use of Paint creek by the defendant is one which is to be determined by the jury; and, as between the plaintiff and the defendant, the jury, in determining that question, are to consider the character of the stream, the necessities and character of the defendant's business and situation, and also the necessity, character, and situation of the plaintiff's business, and must endeavor so to decide the case as to protect the rights of both parties.

"It is for the jury to determine whether the drainage of the defendant's sugar factory and the defendant's lime pond into Paint creek, in the manner in which the evidence shows that it was done, was a reasonable use of the said creek by the defendant; and in determining that question the jury are to consider the circumstances of the case, including the size and character of the stream, the nature and importance of such drainage to the defendant, together with the inconvenience and injury to which the plaintiff was thereby subjected. In determining the reasonable use made of Paint creek, the jury must take into consideration the fact that the plaintiff did not require in his business the use of pure or clear water, but used the water only for the purpose of a motive power.

"In one of the plaintiff's requests, counsel used the word 'pollute,' but I do not understand that by the use of that word plaintiff's counsel meant to maintain that the mere roiling up of the water, if no sediment were deposited, would be any injury to the plaintiff. Any discoloration of the water, where it is used solely for motive power, would be of no importance to the case at all.

"That any use which the defendant may make of Paint creek is to be regarded as reasonable if such use imposes upon the plaintiff only a burden against which the plaintiff can protect himself by a reasonable effort, and at a reasonable expense, and by the exercise of reasonable care. That, in the use of a water power such as the evidence shows was possessed and operated by the plaintiff, prudence required that he should protect his water wheels and gates immediately connected with the water wheels, by a suitable rack, against substances floating in the creek. The evidence shows that a rack is not suitable if the openings between the slats exceed one inch.

I give you that as a good law, gentlemen, unless— Yes; I give it to you as good law, as applicable to this case, or in similar cases, unless the circumstances were such that a rack of that width slats—openings in the slats—would retard unreasonably the flow of water.

"The evidence shows that the Detroit Sugar Company during a campaign at its factory takes from Paint creek about three million gallons of water per day. That is such a quantity of water that it must be all substantially returned to Paint creek above the plaintiff's dam. It is therefore impracticable for the defendant to discharge the water which must be delivered from the defendant's factory through a sewer below the plaintiff's dam.

"I give you that request, gentlemen, provided you find that, in order to carry refuse below the plaintiff's dam, it would be necessary to use any material share of this large volume of water. That request is presented here, gentlemen, because of the evidence introduced on the part of the plaintiff tending to show that it was practicable to construct a sewer from the company's plant to a point lower down in Paint creek than the plaintiff's property. If any appreciable, material amount of water were diverted from Paint creek at the sugar company's plant, and not returned thereto, then, if it did in fact diminish the plaintiff's water power, or lessen it, he would have a right of action for that reason. And this request is meant to enlighten you on that particular subject—whether it is practicable to construct a sewer as was claimed.

"Now, gentlemen, that constitutes all the requests I care to give you, except those relating to the question of damages. And this part of my charge you will consider carefully before you consider the question of damages at all, in order to determine whether or not, under the charge of the court, and the evidence as presented, there is any liability at all on the part of the defendant to the plaintiff.

"If you shall conclude that the plaintiff has established a liability of the defendant, by a fair preponderance of evidence, to pay damages, then you will consider the question of damages, and on that subject I give you the requests of the plaintiff as follows: That, if the jury determine that damages should be assessed in favor of the plaintiff, the damage will be as follows, to wit:

"The reasonable cost and expenses on July 16, 1902, at the time this suit was commenced, of cleaning out and removing the lime deposit and other refuse, if any,

that came from the sugar company's plant into the old pond and the mill race of the plaintiff in this suit; also such sum or sums of money as you shall find, from the evidence in this case, the fair rental value of the mill property of the plaintiff from November 1, 1899, to July 16, 1902, was diminished or lessened by the wrongful acts of the defendant company.

"The plaintiff is under no obligation to provide a dumping ground for the refuse now in this pond and race without any compensation therefor, and if the jury believe that the only practicable, available dumping ground for such refuse is on the land of the plaintiff, then, if the jury find that the placing of such refuse on plaintiff's land is any injury or damage thereto, such damages ought to be allowed him as will compensate him for such injury.

"In arriving at the amount of damages in this case, the jury ought not to consider the question whether the defendant would be more likely to pay a judgment if rendered for a smaller amount than for a larger amount, rather than appeal the case to the Supreme Court, as the question of appeal ought not to be considered by the jury in making up their verdict of damages.    And it ought not to be considered at any stage of the case.

"On the part of the defendant, as having a bearing on the same question—upon the question of damages—I give you requests as follows:

"The plaintiff cannot recover for any damages sustained by him by reason of beets or other substances which escaped into Paint creek from the defendant's premises, and which passed into the flume between the penstock and the water wheels of the plaintiff, and into said water wheels, before he had placed in the raceway a suitable rack, if such rack would have prevented the passage of such beets and substances into said flume and said water wheels.

"Now, I was asked orally by counsel for plaintiff to modify that or add to it by saying that he could recover nothing for the obstruction to his wheel by beets for a reasonable time, and I am willing to add those words, gentlemen; but I feel obliged to say to you, in that connection, that it does seem to me that a man who was skilled in the operation of the mill, and was familiar with the flowage of water that constitutes mill power, would have known very quickly after he discovered that beets were in his wheel that a rack was essential in order to keep them away, so that if one day if he knew beets were

going in there, to my mind, would give him notice—any brief time. Perhaps one day might be a little too short a time, but, if he knew that they were passing in and obstructing it, it would, to my mind, oblige him to erect a suitable rack to stop their passage into the wheel. Now, that request has no bearing whatever upon the question of whether the beets were brought down there which obstructed the flow of water at the rack itself. That refers only to the passage of beets into the wheel from the fact that no rack was there.

"I charge you further on the question of damages, for the defendant, as follows: That the plaintiff cannot recover any damages sustained by him resulting, directly or indirectly, from beets or other substances which escaped into the waters of Paint creek from the premises of defendant, and which passed into the water wheels of the plaintiff, or the gates immediately connected therewith, and which would not have passed into such water wheels and gates if the plaintiff's race had been provided with a suitable rack. That is practically a repetition of the other request. The plaintiff cannot recover damages for the deposit of any material outside of his raceway and pond as they existed prior to the commencement of this suit, viz., July 16, 1902.

"The evidence shows that the freshet of July 3, 1902, carried away all of the sediment from the channel— Notice the language, gentlemen: From the channel of Paint creek above his pond as it existed immediately prior to July 3, 1902. Therefore the plaintiff cannot recover any damages based upon the cost of removing such deposit. Now, that request as originally drawn, gentlemen, read that he could not recover anything because the evidence shows that all the deposit was carried away from the pond as well; but I modified it, gentlemen, so as to make it read 'channel,' instead of 'pond,' to that portion of Paint creek above the dam, because there is a dispute in the evidence on that between the witnesses as to whether the freshet did carry away the sediment from the pond itself. One witness, or perhaps more, on the part of the defendant, claimed that the freshet carried out all the sediment above the dam, which would include not only the channel of the stream itself, but the pond or reservoir, while Mr. Neely himself, and perhaps others on his side (I have forgotten whether there was any more or not), said that it did not remove any sediment, except from the channel

itself, leaving the sides and main body of the pond with the sediment remaining; and the modification of that request, gentlemen, is made because of the dispute in the evidence. If you should find from the evidence that the freshet did actually remove all the sediment at that time, not only from the channel of the creek, but also from the pond, so that it was all removed above the dam of the plaintiff, then the request would be good law, because it would be an absurdity to allow him for wheeling out per cubic yards that sediment and refuse, if in truth and in fact it was all washed out on July 3, 1902, and carried out of the pond by the freshet.

" This case has taken a long time to try, and it is regarded as important by the parties to this case. I have already said to you, and I repeat it to you in conclusion, that you ought not to consider the question of whether Mr. Neely is a poor man and needy; that you ought not to render him a verdict because you think he is needy, or, if you do, it ought not to be a dollar larger on that account. His claim includes, by assignment, something more than his own contract interest. It includes the injury, if any, to the owners of the property, namely, Wilson Bros. So that, while Mr. Neely is nominally the plaintiff, yet in truth and in fact the Wilsons and Mr. Neely are joint plaintiffs, so far as the jury are to consider the case.

" On the other hand, you ought not to render a verdict against the defendant simply because you think it is a large corporation, with a large plant, and that because you might think on that account it is well able to pay; and, while I give you that, I just as cheerfully say to you that the statement of Mr. Holman's as to whether or not the company had made money has no business in this case. Even if it had, and the evidence disclosed that they were not making money, still that ought not to influence your verdict at all, any more than it ought to influence your verdict that Mr. Neely is a poor man.

" I have said to you that you ought not to render a verdict for Mr. Neely, and, if you do, for any large amount, because he is poor; and the same argument and reason would apply to the company if Mr. Holman's statement should happen to be true—of its losing money. It would not render the defendant any less liable to Mr. Neely, nor any less under obligation on their part to recompense him for the injury, if he did receive an injury, because the company are not making money or are poor.

"In other words, gentlemen, you ought to discard from the case all those statements of counsel that might, perhaps, result in influencing you, or possibly might have been designed to influence you, in the case, and consider only the evidence in the case, and the law as given to you by the court, and render such a verdict, if you can, as shall represent your best collective judgment, and as shall hereafter satisfy your individual consciences as jurors, no matter what the verdict may be. If you find a verdict for the plaintiff, you will simply announce that you find for the plaintiff, and name the damages in a gross sum. If the verdict is for the defendant, you will simply announce, through your foreman, no cause of action or not guilty."

Counsel discusses the assignments of error under six heads:

1. Measure of damages.
2. The relative rights of the plaintiff and defendant as riparian proprietors.
3. The admission of oral proof of the sale of lands.
4. The right to recover for damages to the fee.
5. The identity of the lands.
6. The right of the jury to consider remarks of counsel.

We will consider them in the inverse order:

(6) This is based on the following portion of the charge:

"In other words, gentlemen, you ought to discard from the case all those statements of counsel that might, perhaps, result in influencing you, or possibly might have been designed to influence you, in the case."

Counsel says:

"We submit that that was error. Counsel for the parties have the right by fair argument to influence the minds of the jury, and the jury should consider such arguments. Such arguments consist in part of statements of fact, and in part of inferences drawn from them. If a statement of fact is made by counsel which is warranted by the evidence, or if a statement is made by counsel which is a fair inference from the matter in evidence, the jury should consider it. They are not bound by it, but they should consider it. The untruthful or unwarranted statements of counsel are, of course, to be disregarded by the jury. But this does not mean that all statements of counsel are to be disregarded by the jury."

If what counsel has quoted from the charge is read in connection with what precedes and follows it, we think it was entirely unobjectionable.

(5) It is claimed the proofs do not show injury was done to the lands described in the declaration. An examination of the record discloses there was testimony bearing upon that subject.

(4) It is urged that, under the record as made, plaintiff was not entitled to damages to the fee of the land. The record discloses that plaintiff was in possession under a land contract from the Wilsons, who, the testimony tends to show, more than 30 years ago obtained deeds to the property, and who, with plaintiff, had been in continuous possession. It also shows that the Wilsons had assigned to the plaintiff any cause of action they had before the suit was brought. We do not think this assignment of error was well taken.

(3) The defendant produced Samuel Barnes as a witness, and, in answer to a question put by its counsel, stated he at one time owned the mill property. On the cross-examination he stated he sold to the Wilsons. We do not think this assignment of error is well taken.

(2) The relative rights of the plaintiff and defendant as riparian proprietors:

Counsel says:

"We submit that there are many inconveniences and damages which the upper riparian proprietor may inflict on the lower riparian proprietor for which the lower riparian proprietor cannot recover. He can recover only for the damages resulting from the 'unreasonable' use of the stream by the upper proprietor."

He complains of the following in the charge:

"If the jury find from the evidence in this case that the defendant, the Detroit Sugar Company, its agents or servants, during the campaigns (so called) of said company from November 1, 1899, to July 16, 1902, have deposited into Paint creek, and from thence into the pond, race, flume, and water wheel of the water power and mill of the

plaintiff, such quantities of beets, tops of beets, beet roots, lime mud, lime, sand, and dirt, and other refuse from its sugar plant, as to materially and unreasonably lessen, diminish, injure, and damage such pond, race, and mill property, then such user and such acts of the defendant with the said waters of Paint creek would be an unreasonable use thereof, and would render it liable in this action to the plaintiff for the damages it has occasioned him, if any,"—

And says:

"The evil of that request lies in the last two lines above quoted, viz., 'and would render it liable in this action to the plaintiff for the damages it has occasioned him, if any.' Not 'for the damages it has occasioned him, resulting from unreasonable acts.' No; the clause is not so limited. The language is 'the damage it has occasioned him.' That is equivalent to saying 'all the damage it has occasioned him,' whether resulting from 'unreasonable' acts or any other acts, 'reasonable or otherwise.' "

We think counsel drew a conclusion from this portion of the charge which the jury would not, especially when taken in connection with the rest of the charge.

(1) Measure of damage:   Counsel says:

"We submit that the true measure of plaintiff's damages was the depreciation in rental value for such time only as elapsed after the deposit began, down to the time when, by the exercise of due diligence, the plaintiff could have removed the same, and that such loss in rental value can be recovered only for the time during which the deposits in the race and pond of the plaintiff, brought about by the acts of the defendant, actually affected or impaired the usefulness of the plaintiff's mill and property."

Counsel for the plaintiff say:

"We respectfully submit that if there is anything in the point that it was the duty of the plaintiff to have cleared out this deposit in the pond and race soon after the end of each campaign of the company—a proposition which we do not believe the law warrants or contemplates —then it was the duty of the defendant to have raised the question in the court below, which was not done either at the time the evidence was introduced, or in any of the requests presented by the defendant."

Counsel for defendant says:

"The question was raised on the trial in various ways, and was the subject-matter of several assignments of error."

The most marked instance of where counsel says the question was raised is as follows:

"*Q.* Now, Doctor, are you acquainted with the fair rental value of this mill and mill property before the month of July, 1902?  *A.*  What is the question?

"*Q.* I asked you whether or not you were acquainted with the fair rental value of this mill July, 1902?  *A.* Yes, I was acquainted with its value and rental purposes.

"*Q.* And what would you say for three years previous to July, 1902, would be a fair rental value of this property?

"*Counsel for defendant:*  We object to that.

"*The Court:*  Same objection to the other witness, I suppose.

"*Counsel for defendant:*  Same objection as to the other testimony.  The question should be confined to the rental value during the time that the mill has been shown to have been idle here, and we object to this as incompetent and immaterial.

"*The Court:*  Same ruling. (To which said ruling counsel for defendant did then and there except.)

"*Q.* (Question repeated.)  *A.* Without any obstructions to the race?

"*Counsel for defendant:*  Same objection.

"*A.* That is, when it is clear?

"*Q.* Yes.

"*Counsel for defendant:*  Same objection.

"*The Court:*  Take it.

"*A.* It ought to be five or six hundred dollars.

It will be observed this objection did not suggest to the court or to counsel that it was claimed the plaintiff, as soon as practicable, must remove the deposit, and, as he had not done so, he could not recover.

Our attention has not been called to a case where the courts have said that where, at yearly intervals, large deposits are unlawfully made in a mill pond and race, each spring thereafter the mill owner must proceed to remove

them, and, if he did not, could not recover damages. The question might be pertinent, Where would he put the deposits? He could not carry them back from whence they came. Must he take them out of the pond and race and put them upon arable land? Suppose the pond, race, and buildings substantially cover the mill property; What then will he do with them? As the record is made, however, we do not deem it necessary to determine these questions. The court met the issue fairly as it was presented to him. He gave the substance of nearly all of the requests of the defendant bearing upon the question of damages. His charge was a fair, full, and impartial statement of the law as applicable to the case as presented. See the following cases: *Dumont* v. *Kellogg*, 29 Mich. 420; *Thunder Bay River Booming Co.* v. *Speechly*, 31 Mich. 336; *Buchanan* v. *Log Running Co.*, 48 Mich. 367; *Woodin* v. *Wentworth*, 57 Mich. 278; *Wooden* v. *Manufacturing Co.*, 106 Mich. 412; *Stock* v. *Township of Jefferson*, 114 Mich. 357; *People* v. *Hulbert*, 131 Mich. 156, and the many cases cited therein.

Judgment is affirmed.

The other Justices concurred.