## MORGAN and others *vs.* KING and others.

If a stream has no capacity to be used for the purposes of trade, commerce, or navigation, it belongs absolutely to the riparian owner; and, by well settled principles, the legislature cannot make it a highway by simply declaring it to be△ne. That being a taking of private property for public use, the owner is entitled to compensation.

The owner is also entitled to compensation before the legislature can make a stream public by improving it,. if not before subject to public use.

But if it be a public river, the legislature may not only declare it to be so, but may improve it, remove impediments to its navigation, and grant permission to erect dams, booms, &c., and prescribe the mode in which they shall be built, and perhaps obstruct the navigation entirely.

The legislature, when acting within the pale of the constitution, has full power over streams. And where a river is public, and entirely within the state, the care and control of it, so far as public use is concerned, belongs to the state; especially if it cannot be used for the purposes of commerce with foreign nations, or among the states.

When the facts are ascertained, or admitted, whether a river is public or not, is a question of law. But whether any particular obstruction or erection be a nuisance, or a damage to the navigation, is a question for the jury.

If a river is a public highway, all impediments to its use, such as dams, piers, booms, &c., unauthorized by the legislature, are nuisances. But if it can be used only for certain purposes, the riparian owner is only bound not to obstruct it in that respect. If it can be, and is, a highway only for the passage of single logs, he may use the river and its banks for every purpose not inconsistent with that public use.

Whether a capacity to float single logs at random, and that only during freshets, will make a stream public ? *Quære.*

*It seems* it is not necessary that the subject of transportation should be constantly under the immediate manual guidance or control of some person; nor that the stream should be adapted to the transportation of all kinds of property, or of passengers; nor that its navigation should be unbroken by portage.

Nor is it conclusive that it becomes too dry and shallow at times, periodically, or otherwise, for navigation or transportation. The capacity of a stream, which generally appears by the nature, amount, necessity and importance of the business that can be done upon it, is the criterion.

Hence a brook, although it might carry down saw-logs for a few days, during a freshet, is not therefore a public highway. But a stream upon which, and its tributaries, saw-logs to an unlimited amount can be floated every spring, and for the period of from four to eight weeks, and for a distance of 150 miles, has the character of a public stream, *for that purpose;* the purpose being useful for trade and commerce, and to the interests of the community.

Where the public have the right to use a stream, as a highway, for the purpose of floating logs and lumber, the right must be exercised with a regard to the

rights and claims of others, and to the privileges of those engaged in similar enterprises.

If the statute prescribes no different rule, each riparian owner may use dams, booms, and other reasonable means to stop his own logs; and if, in attempting to stop his own, he necessarily stops those of others, he will be justified in so doing; provided he releases them with all reasonable diligence.

The provision in the 5th section of the act of April 10, 1850, declaring Raquette river a public highway, which authorizes persons desirous of floating logs or lumber down said river, to construct a shoal or apron in connection with any dam across the stream, and to reconstruct any boom already constructed in, over and across it, in such manner as to allow logs and lumber to pass, &c., was a mere *license*, and not *compulsory*.

It is not to be construed as requiring owners of logs to put aprons on all the dams existing at the time the act was passed, and of reconstructing all the booms in the river, before they could be allowed to float such logs down.

Section third of that act, requiring an open passage of thirty feet, extends to all booms in the river, whenever constructed. But this does not deprive the owners of the right to secure their own logs. They may close the booms at all times, when required for that purpose.

But in taking care of their own property they must do no more damage to others than is absolutely necessary. They are therefore bound to release the logs of others, which may have been so detained, as soon as can reasonably be done, under the circumstances.

THIS was a motion on the part of the defendants to dissolve or modify an injunction. The plaintiff owned a dam, boom, and saw-mill on Raquette river, at what is called Raquetteville, near the Northern Railroad in the town of Potsdam, about five miles below Potsdam village, which they valued at more than $30,000. These mills were built in 1852 and 1853, and the plaintiffs alleged that they were capable of cutting 10,000,000 feet of lumber annually. They had another boom, dam and saw-mill in Colton, about nine miles above the village of Potsdam. They also owned wild lands on the banks of the River Raquette and its tributaries, mostly in Franklin county, from which they obtained saw-logs to supply their mills. The only way of transporting these logs was down the Raquette. The defendants (one of them excepted, who was in the employment of the others) owned a boom, dam and saw-mills on the same river, in the town of Potsdam, three miles above those of the plaintiffs, which they purchased in the fall of 1852, and paid therefor about $34,000.

A boom quite across the river, and sufficient to stop logs, had been built there, and was completed in March, 1849. And the present boom of the defendants, which also extended quite across the river, was completed before the 10th of April, 1850. The defendants owned wild lands, mostly in the county of Hamilton, from which they obtained logs to manufacture at their mills, by floating over the lakes of which the Raquette is the outlet, and then down that river to their mills. Their lumber establishment cost them over $70,000, and was worth much more. The lumber manufactured by all these mills was taken by the Northern Railroad to Lake Champlain, and thence by water to the markets on the Hudson. The boom of the plaintiffs and that of the defendants, at their respective mills below the village of Potsdam, would hold 100,000 saw-logs each; and they had side booms of less capacity. In the winter and spring of 1854 the plaintiffs got into the river a large quantity of logs, at a distance of from twenty to sixty-five miles above their mills in Potsdam; which, with other logs intended to be sawed at those mills, were floated down in the spring; but, as they alleged, 15,000 of them were stopped by the defendants and were then in their boom. And it was stated in the moving affidavits on the part of the defendants that several thousand of them were there, and had become intermixed with those of the defendants; and that the defendants had declined to let their boom be opened to let out logs. But it was further stated that the "drive" of the defendants amounted to 35,000 logs, worth about $2 per log; and that if they had opened their boom, two thirds of the logs would have passed down to the boom of the plaintiffs. The defendants further alleged that one of the plaintiffs, on the proposition being made to him, had refused to join in building a separating boom; and also declined to exchange any logs that should get misplaced in their respective booms. The Raquette river is the outlet of some lakes and ponds in Hamilton, and also in St. Lawrence and Franklin counties, and empties into the St. Lawrence in the county of St. Lawrence, near the boundary line of the states; and its length, including one or two of the lakes which formed its head waters and were connected by

outlets, was said to be over 150 miles. On the 9th of April, 1850, the legislature appointed commissioners, and appropriated $10,000 to improve its channel, and for the construction of such piers, booms and dams, as might be necessary for the passage of logs and lumber, from its source to Atwater's mills, which are about twenty miles above its confluence with the St. Lawrence. And in April, 1854, $10,000 more were appropriated for the purpose of cleaning and improving the rafting channel of the river, by the construction of booms, piers and dams, and removing obstructions to the passage of logs and lumber over it and its tributaries, from the north line of Potsdam to Racket Lake in Hamilton county, and for the purpose of making such reservoirs of water as might be necessary for driving logs. On the 10th of April, 1850, the legislature passed an act, by the first section of which, the river was declared to be a public high- way from the foot of Racket lake in Hamilton county to its mouth. By the second section, no dam was thereafter to be erected without an apron at least 30 feet wide in the middle of the current, and of a proper slope for the passage of logs and timber. By the third section, it was required that all booms made above any dam should have an open passage or water way of at least thirty feet in width, which might be closed except when necessary to be opened for the passage of logs. By the fourth section, any person willfully obstructing the channel by booms or otherwise, so that said space of thirty feet in width should not be open for use, should be liable to a penalty of $25 per day, to be sued for by the party aggrieved. By the fifth section, persons desirous of floating logs or lumber down the river, might construct a shoal or apron in connection with any dam across the stream; and might reconstruct any boom already constructed in, over and across it, in such manner as to allow logs and lumber to pass, doing no unnecessary damage, and paying to the owner or occupant such damages as he might sustain by the alteration; but the act was not to be "construed to impair or abridge any private or individual rights, except so far as is necessary for the improvement of said river, and floating logs and lumber down the dam." (*Laws of* 1850, *p.* 576.) In

1851 this last section was amended, by providing for the assessment of the damages sustained by the owner, by commissioners appointed by the county court; and provision was also made for marking logs put into the river for rafting. (*Laws of* 1851, *p.* 587.)

The affidavits were very conflicting upon the question of the use and capacity of the river to float logs, in its natural state. Those on the part of the defendants stating that logs could not be transported, at least not advantageously, before the improvements; being prevented by the falls and rocks; that there was a low, shallow place near the site of the defendants' mill; and that the time of floating, since the improvements, did not exceed four weeks, and was only during the spring freshets. Those on the part of the plaintiffs alleged that thousands of logs had passed down the river before the so called improvements, and that the improvements were of very little benefit for that purpose; that logs, lumber and oak timber for the Canada market, and provisions, had been taken down the river from the present site of the village of Potsdam before the railroad was built; and that the rafting or floating season would average two months every spring. And in one affidavit, the river, and the lakes of which it was the outlet, were described with some particularity; and from that, it would seem that there were, above the village of Potsdam, over 100 miles of boating, which was broken in various places by land carriage, varying from a few rods to a mile in extent; and making in all, about six miles.

The plaintiffs, in their complaint, asked for a judgment declaring their right to pass logs to their mills; that the defendant should not detain them, or obstruct the natural passage; for damages for detention, and also that they might recover the penalty of $25 per day, under the statute; that the defendants might be restrained from obstructing the river, and also be restrained from preventing the plaintiffs from removing any obstruction to the passage of their logs, and logs intended to be sawed at their mills; and for other and further relief. An injunction was granted *ex parte*, according to the prayer of the complaint. On the motion of the defendants to dissolve the injunction, it was afterwards so modified as to strike out that part restraining the de-

fendants from preventing the plaintiffs removing the obstructions; but restrained them from preventing the plaintiffs removing their logs in a proper manner, and this modification was without prejudice to a motion to dissolve after answer. The defendants answered; and among other things denied that logs could have been floated down the river before the improvements under the act of 1850; or since, except for a few weeks during spring freshets; and denied that they had willfully detained the logs of the plaintiffs; but admitted that they had necessarily stopped some of them, as it was impossible to do otherwise and stop their own; but that they had let out the logs of the plaintiffs as fast as they were released by sawing their own, and they insisted they, the defendants, as riparian owners, had a right to do as they had done. They also pleaded that the plaintiffs had not reconstructed the boom of the defendants,

After putting in the answer, the defendants again moved, at the Franklin special term, to dissolve or modify the injunction, but very important criminal business in the oyer and terminer engaged so much of the time of the judge, the court ordered the motion to be argued before Mr. Justice Hand at his chambers; and it was argued there accordingly.

*W. A. Dart,* for the motion.

*E. H. Rosekrans,* for the plaintiffs.

HAND, J. The defendants object that the injunction was allowed before the summons was served, or the suit in fact commenced. If they are right, as to the fact and the rule of practice, when they procured the modification, the motion to dissolve was denied without prejudice to their right to renew the motion to dissolve after answer. I think that necessarily disposed of this preliminary objection; for the answer could be of no service in deciding that branch of the motion.

The injunction which the defendants seek to remove, restrains them from " obstructing the Raquette river by means of any dam, pier, boom, logs or otherwise, so as to prevent the passage of the logs of the plaintiffs" to their mill, " and from preventing the plain-

Morgan *v.* King.

tiffs removing, and from interfering with the plaintiffs, their servants or agents, while removing, in a proper manner," their logs "through and out of the pond and booms controlled by or in the possession of the defendants." The counsel on both sides argued the question of the rights of the parties generally; and if the defendants have a right, not only to stop the passage of the logs of the plaintiffs to their own mills below, but to prevent them from removing their own logs from the pond or boom of the defendants, after they have been stopped by such boom, it must be on the ground that the defendants are the absolute owners of the river at that place; and that the public have no right of passage whatever; unless the defendants can also justify such detention, as being necessary to the preservation of their own property.

There are certain general principles applicable to rivers, which necessarily have an important bearing upon this motion. The courts have taken Sir Matthew Hale's celebrated treatise *De Jure Maris*, &c., as a text book; and it would seem that very few questions can arise, except in the application of its doctrines to the circumstances of each particular case. Some of our streams differ in many respects from those of the old country; still, I think, those general principles that govern there, must to a great degree control here. Where there is a flux and reflux of the tide, *prima facie*, the stream is navigable; and the river, including the soil under it, is the property of the public. (*Ang. on Wat.* 204. 3 *Kent*, 427, 212, 414. *Munson* v. *Hungerford*, 6 *Barb.* 269. *Miles* v. *Moore*, 5 *Taunt.* 705. *Rex* v. *Smith*, *Doug.* 441.) Above the flow and reflow of the tide, it is not what is termed "navigable," and the owner of the banks is the owner of the bed of the river, and has the exclusive right of fishery. (*Hooker* v. *Cummings*, 20 *John.* 90. *The People* v. *Platt*, 17 *Id.* 195. *Carte* v. *Muscot*, 4 *Burr.* 2162. 3 *Kent*, 412, 414.) But it may be subject to an easement therein, or a right of passage as a public highway by water. In its natural state, the servitude of the public interest depends upon the capacity of the stream to be used for the purpose of trade, commerce, or navigation. Lord Hale mentions barges and lighters, as well as oth-

er vessels. (*See De Jure Maris, ch.* 1, 2, 3.) But other modes
of transportation have been recognized in some cases decided in
this country; as the floating of rafts and logs; and rafting tim-
ber and lumber. (*Brown* v. *Chadbourne,* 31 *Maine Rep.* 9.
*Shaw* v. *Crawford,* 10 *John.* 236. *Browne* v. *Scofield,* 8 *Barb.*
239. *People* v. *Canal App.* 13 *Wend.* 371. *Munson* v. *Hun-
gerford,* 6 *Barb.* 269.) If the stream have no such capacity, it
belongs absolutely to the riparian owner; and, by well settled
principles, the legislature cannot make it a highway by simply
declaring it to be one. That would be taking private property
for public use; and the owner is entitled to compensation. (*Peo-
ple* v. *Platt, supra. Const. art.* 1, § 7. *Bloodgood* v. *Mohawk
and H. R. Co.,* 18 *Wend.* 9. 25 *Id.* 462. 3 *Hill,* 567. *Canal
Com'rs* v. *The People,* 5 *Wend.* 423, *per Walworth, chan. and
Allen, senator.*) And the owner is also entitled to compensation
before the legislature can make it public by improving it, if not
before subject to public use. But, on the other hand, if it be a
public river, the legislature may not only declare it to be so,
but may improve it; remove impediments to its navigation; and
also grant permission to erect dams, booms, &c.; and perhaps
obstruct it entirely. I am aware that it has been said the crown
cannot grant a right to obstruct a public navigable river. (*Wil-
liams* v. *Wilcox,* 8 *A. & E.* 314. 3 *Kent,* 427.) But parlia-
ment can. (*Woolr. on Ways,* 60. *Rex* v. *Montague,* 4 *B. &
C.* 498. *And see Abraham* v. *R. C.,* 16 *Q. B. Rep.* 586. *Reg.*
v. *Betts, Id.* 1022.) And our legislature, when acting within the
pale of the constitution, has full power over the matter. And
where a river is public, and entirely within the state, the care
and control of it, as far as public use is concerned, belongs to the
state; especially if it cannot be used for the purposes of com-
merce with foreign nations, or among the states. (*Veazie* v.
*Moor,* 14 *How. U. S. R.* 568, *and cases there cited. Moor* v.
*Veazie,* 32 *Maine R.* 343.) This river empties into the St. Law-
rence; but, if navigable and a public river, at least, until con-
gress, if that could be, shall interfere, the legislature can author-
ize the erection of dams, booms, &c., and prescribe the mode in
which those so authorized shall be built.

Morgan v. King.

But the principal question, and the one argued with much zeal on this motion, is, whether the public have any right of way on this stream. Several cases upen the subject, decided in this state, were cited and commented upon by counsel. (*See Munson* v. *Hungerford,* 6 *Barb.* 265 ; *Browne* v. *Scofield,* 8 *Id.* 239 ; *Curtis* v. *Keesler,* 14 *Id.* 511 ; *Shaw* v. *Crawford, supra ; Ex parte Jennings,* 6 *Cowen,* 518 ; *Palmer* v. *Mulligan,* 3 *Caines,* 307 ; *People* v. *Platt, supra. And see Moor* v. *Veazie, supra.*) I think, where the facts are ascertained or admitted, whether a river is public or not, must be necessarily a question of law. But whether any particular obstruction or erection be a nuisance, or a damage to the navigation, seems to be a question for the jury. (*Abraham* v. *Railway Co., supra.*) In this case, the statements in the depositions, on some points, are in conflict. From those on the part of the defendants, it would seem that the river from Tupper's lake to the mills of the defendants, descends about twelve hundred feet ; that logs could not be driven to advantage, if at all, before the improvements made under the acts of 1850 ; and that now they will float but a short time, and only during the spring freshets ; and that the water was very shallow at or near the site of the mills of the defendants, when the river was in its natural state. On the other side, it is alleged that, in its natural state, this stream was ample for all the purposes of driving logs from the lakes above, to the mills of the plaintiffs, for about two months in each year. That from the village of Potsdam down to its mouth, it has been long used to transport lumber, timber and provisions, and float logs ; and that timber and lumber were taken from a point above the mills of the defendants to the Montreal and Quebec markets, more than thirty years since. This discrepancy can hardly be reconciled ; and probably a jury must ascertain the facts, before the rights of the parties can be settled with certainty. Evidence taken *ex parte* is seldom satisfactory. In this case, some of the most important statements on the part of the plaintiffs, especially those representing in strong terms the natural capacity of the stream, and the little advantage derived from the appropriations by the state, are verified by one who is interested in the water power at

Colton, and is one of the commissioners under the act of last session for improving the river. So, too, on the part of the defendants, the gentleman whose affidavit may be considered the most depreciative of the navigable qualities of the river, and upon whose opinion others, in making depositions, seem to rely, and who is the defendants' source of title to a portion at least of this property, it appears by his own statement, more than a year before the act to improve the river, built a boom quite across it, of sufficient strength to prevent the passage of logs; and must have expended a large sum in the erection or purchase of mills below the village of Potsdam. It is also carefully stated, that the present boom was completed before that act was passed. The plaintiffs state the value of their mills, dam, boom, &c., to be over $30,000; and those of the defendants, the latter estimate much higher; and yet both depend upon the Raquette river for supplies of material to manufacture. The plaintiffs have also mills and dams above the mills of the defendants; and if there is no right of passage, the logs of the defendants may be stopped, and thereby their large purchases above, and probably all their mill property, rendered comparatively valueless. The truth undoubtedly is, that the Northern Railroad, which was completed some three or four years since, has opened an outlet for a portion of the immense and rich forest productions, spread over that vast plateau of head-waters found in Northern New-York. And Raquette river, one of those valuable streams for which the southern slope of the valley of the St. Lawrence river is so remarkable, and through which several navigable lakes, some of them in the very heart of a great wilderness, discharge their waters, suddenly has become of great importance, as a channel for those productions. Under such circumstances, very little argument can be drawn from its nonuser heretofore.

But, notwithstanding upon this question of the right to float logs, may depend the value of lands, timber and lumber, to a vast amount, still, if the river is exclusively private property, no matter how pressing the public necessity, the owner is not obliged to yield one jot or tittle, except by direction of the sovereign power; and then not without compensation.

In *Brown* v. *Scofield* it was suggested that the common law of England was not adapted to the subject of inland navigation in this country ; and so, as to large rivers, it has been decided by the courts in Pennsylvania. So far, it seems, the principles of the civil law prevail in that state. No doubt the genius of our institutions, the nature and condition of the country, and the pursuits of the people, make some portions of the common law, and to a certain extent, necessarily inapplicable here. But, except as to our internal polity, and alterations made by the constitution and by positive enactments, there is not much diversity ; and certainly not in this state; and, as the courts are to expound, and not make the law, especially on all questions affecting real estate, *stare decisis* is the safe rule. The treatise of Lord Hale has received high commendation in this country ; and in this state, that portion of it relating to this subject has been sanctioned by our courts ; and its doctrines, I think, may be applied to this case, and justice be done to all parties. If the Raquette river is a public highway, all impediments to its use, dams, piers, booms, &c., unauthorized by the legislature, are nuisances. (*Palmer* v. *Mulligan, supra. De Jure Maris, ch.* 3.) But, if it can be used only for certain purposes, the riparian owner is only bound not to obstruct it in that respect. If it can be, and is, a highway only for the passage of single logs, he may use the river and its banks for every purpose not inconsistent with that public use.

But it is said, a capacity to float single logs at random, and that only during freshets, does not make it public. Upon this point there would seem to be a contrariety of opinion ; and I have had some doubts. But I am inclined to think it is not necessary that the subject of transportation should be constantly under the immediate and manual guidance or control of some person ; nor that the stream should be adapted to the transportation of all kinds of property, or of passengers ; nor that its navigation should be unbroken by portage. If so, the Hudson river above Waterford is not a highway for any purpose. Nor is it conclusive that it becomes too dry and shallow at times, periodically or otherwise. (*Shaw* v. *Crawford, supra. Brown*

v. *Chadbourne, supra. Mayor of Colchester* v. *Brooke,* 7 *Q. B.
Rep.* 389, 374.)    There are remarkable instances of this, both
in the old world and the new ; and it is more or less character-
istic of all rivers.    The rise and fall in the Ohio, for example,
is very great ; and yet, at common law, it would be considered
subject to the public servitude.    The capacity of a stream, which
generally appears by the nature, amount, importance and neces-
sity of the business that can be done upon it, I think, must be
the criterion.    A brook, although it might carry down saw-logs
for a few days, during a freshet, is not therefore a public high-
way.    But, a stream upon which, and its tributaries, saw-logs to
an unlimited amount can be floated every spring ; and for the
period of from four to eight weeks, and for the distance of one
hundred and fifty miles, and upon which, unquestionably, many
thousands will be annually transported for many years to come,
(if it be legal to do so,) has the character of a public stream *for
that purpose.*    So far the purpose is useful for trade and com-
merce, and to the interests of the community.    The floating of
logs is not mentioned by Lord Hale ; and probably no river in
Great Britain was, in his day, or ever will be, put to that use.
But here, such is common, necessary and profitable, especially
while the country is new ; and if it be considered a lawful mode
of using the river, it is easy to adapt well settled principles of
law to the case.    And they are not less applicable because this
particular business may not always continue ; though if it can
of necessity last but a short time, and the river can be used for
no other purpose, that circumstance would have weight in the
consideration of the question.

Thus far the question has been considered upon the principles
of the common law ; but in this case the legislature has also de-
clared this river to be a highway for the purpose of floating logs
and lumber.    (*Laws of* 1850, *ch.* 264.)    Although that alone
would not be sufficient, if it be wholly private, still it is evidence
that it is not so, which should not be lightly disregarded.

If then, the public have the right to use the stream to that
extent, the remaining question is, how that right is to be exer-
cised ?    It by no means follows that its waters may not be ap-

Morgan *v.* King.

propriated for any other purpose. If so, dams, booms, mills, and even bridges may all be nuisances : the right to float logs being paramount to every other right, all obstructions thereto are unlawful. But, (without reference to the statute,) the right must be exercised with regard to the just claims of others. Thus, it would not be justifiable to drive down immense quantities of logs at one time, if the property of riparian owners, rightfully there, would by endangered thereby. Regard must be had to the fact that the floating masses are not under the immediate control of human agency. The right must be exercised *sub modo.* So, too, the privileges of others engaged in similar enterprises must be respected. If each proprietor may not stop his own logs, unless he can do so without stopping those of others, he only who is lowest on the stream will derive any benefit from this mode of transporting property ; unless (which I suppose to be impossible) the logs can be separated when in motion. If the statute prescribes no different rule, it follows that each owner may use dams, booms and other reasonable means to stop his own logs ; and if, in so doing, he necessarily stop those of others, he will be justified, if he release them with all reasonable diligence. From the nature of the business, and the necessity of the case, there must be some inconvenience, and mutual sacrifices.

But it is said the plaintiffs should have reconstructed the boom of the defendants in such manner as to allow logs and lumber to pass, pursuant to the provisions of the act of 1850, (*ch.* 264,) as amended in 1851, (*ch.* 303.) We are not informed how this could have been done. On the contrary, it is said the logs of the defendants could not have been secured if, at the time, their boom had been opened to let other logs pass. And, besides, it could hardly have been intended that the owner of a quantity of logs should not be allowed to float them down, until he had been to the expense of putting on aprons to all dams existing at the time the act was passed, and of reconstructing all the booms in the river. Private ways are now authorized. (*Const. art.* 1, § 7.) But this river is in no ·sense a private way, and beyond that, there is no power to take, or that can give authority to take, private property for private purposes, with or without compen-

sation. But if this provision be considered feasible and legal, still I think it a mere license, and not compulsory. And as to booms, I think section third of the act of 1850, requiring an open passage of thirty feet, extends to all booms in the river, whenever constructed; but that does not deprive the owners of the right to secure their own logs; and they may close them at all times when required for that purpose. But in taking care of their own property, they must do no more damage to others than is absolutely necessary; and they are therefore bound to release the logs of others, which may have been so detained, as soon as reasonably can be done under the circumstances.

It follows, that the defendants were justified in doing, on their own premises, what was indispensable for the preservation of their property; and if the passage of the logs of the plaintiffs was thereby of necessity obstructed, the latter cannot complain. But the defendants should not detain them longer than absolutely necessary; much less should they prevent the plaintiffs' removing their own logs in a reasonable manner.

The injunction must be modified upon these principles.

Ordered accordingly.

[At Chambers, August 8, 1854. Hand, Justice.]