COE H. TEN EYCK, Respondent, *v.* THE TOWN OF WARWICK and Others, Appellants.

*Navigable stream — not created by the artificial deepening of a stream by a dam.*

When a stream not naturally navigable flows into a lake, and by the erection of a dam by a private corporation having the privilege of drawing off the water and owning the fee of the land flooded, the lake is turned into a reservoir, and the water is thus caused to back up in the stream so as to make it navigable, such stream does not thereby become technically a navigable stream, and a bridge across it on the line of a highway is not a public nuisance.

The common-law definition of a navigable stream, namely, one in which the tide ebbs and flows, has never been adopted in this country, but the rule adopted here is that of the civil law, which makes a stream navigable where in its ordinary or natural state and condition the stream is capable of use by the public in floating or transporting the products of the country; it is not necessary that the property transported should be carried in boats, or that the stream should be continuously fit for such use, or such that it can be so used against the current.

APPEAL by the defendant, William A. Randall, as commissioner of highways of the town of Warwick, Orange county, New York, and the said the Town of Warwick, Orange County, New York, from an order of the Supreme Court, made at the Dutchess County Special Term and entered in the office of the clerk of the county of Orange on the 14th day of November, 1893, enjoining the defendant from closing a swing bridge over a stream.

*Bacon & Merritt* and *George W. McElroy,* for the appellants.

*James Parker,* for the respondent.

DYKMAN, J.:

This is an appeal from an order continuing an injunction.

The defendants besides the town are the commissioners of highways, and the object of the action is to prevent and restrain them from closing a bridge over a stream which leads into the lower portion of Greenwood lake.

There is a large number of affidavits on both sides, and we have endeavored to glean from them facts which are either uncontradicted or satisfactorily established upon which to base our conclusion. In that effort we find the following facts :

Greenwood lake was formerly called Long pond and lies partly in the State of New York and partly in the State of New Jersey. The portion in New York was in Orange county.

In its natural condition the lake was about six miles long from north to south and about three-quarters of a mile wide. No navigable stream ever issued from the lake, and there was far back into time an old dam at its lower end. Neither was there any inlet except small brooks or mountain streams. There was a highway leading from the Chester road to the northerly end of the lake near where the Windmere Hotel now stands, and from there easterly to and across a small stream of water called Sucker brook, which emptied into the lake at its northerly end near the Waterstone Cottage.

That road was carried across the brook by an ordinary plank bridge. The brook was about three and a half miles in length, three or four feet wide and quite shallow. That brook ran in front of the premises occupied by the plaintiff, through level meadow land, but below there the banks of the stream were higher.

About the year 1835 the Morris Canal and Banking Company constructed a dam at the southerly end of the lake about ten feet in height for the purpose of creating a feeder for its system of canals in the State of New Jersey.

After the erection of that dam the water raised by means of it, filled up the channel of Sucker brook and flowed out over the meadows above, and so formed what is now termed the northerly portion of the lake. The hotel of the plaintiff is about one mile north of the original northerly end of the lake, and upon the portion thereof so formed by the slack water held by the new dam of the Morris Canal and Banking Company. When the water was so raised by means of such dam it submerged the old road and bridge, and left them about six feet under water, and thereafter there was a road opened farther up, and on higher ground, and a bridge was constructed at the place where the bridge in dispute now stands over which the new road was carried.

That road and bridge were constructed by persons living on the east side of the lake, who were cut off by the submergence of the old road and bridge. The bridge was made of plank which rested upon wooden sleepers in the ordinary manner. Rowboats could pass

under it but no others. That road was used by the public and was subsequently adopted as a public highway by the town of Warwick, Orange county.

The lands overflowed by the raising of the dam were paid for by the Morris Canal and Banking Company, which has and exercises the right to draw off the water at its pleasure.

The bridge so erected by private parties, and afterwards adopted and maintained by the public authority of the town, was as complete an obstruction to navigation as the present bridge. That bridge was repaired from time to time and was finally condemned as dangerous.

In the fall of 1891 the plaintiff commenced the construction of a steam launch above the bridge, and completed her in the forepart of the year 1892. Upon her trial trip the plaintiff desired to run her down the stream into the lower part of the lake.

Upon reaching the bridge the plaintiff signed a written instrument by which he agreed to replace the bridge if it was removed, and it was thereupon demolished and the boat passed along.

The plaintiff did not replace the bridge, and it remained down for some time, and that seems to have been the period during which the plaintiff operated his boat up and down the stream.

Some facts in relation to the construction of this draw, or swinging bridge, are not unimportant. After the old bridge was broken down to allow the passage of the plaintiff's boat, he requested the commissioners of highways to build the new bridge so high up that his steamer could pass under the same, and proposed to build the approaches to such bridge at his own expense if it was so built higher. Upon ascertaining the expense of such approaches, however, he declined to build the same.

Thereupon the plaintiff proposed to the town officers that they should build a swing bridge, and promised, if such a bridge was built, that he would take charge of the same, open and close it and save the town harmless from all expense and damage resulting from the same.

The town officers desired to accommodate the plaintiff and to facilitate him in his business, and for the purpose of such facilitation, and in reliance upon his promise and agreement, they built a swing bridge, which they would not have done except for his prom-

ise. These facts manifest the reason why the bridge was constructed so as to swing, and dispose of the claim that the defendants are under obligation to operate the bridge as a swing bridge because it is constructed in that way.

After the completion of the new bridge the plaintiff refused to carry out his agreement to operate the same, and demanded that the town should open and close it. Such demand was based upon the proposition that the water under the bridge was public navigable water, and that the town could not obstruct the free use and navigation thereof.

Thereupon the commissioners of highways fastened up the bridge and expressed the intention to close the same permanently. This suit was then commenced and a preliminary injunction obtained, and from the order continuing the same this appeal is taken.

The claim of the plaintiff is based upon his right in the stream in question as a public navigable stream of water, and unless it be such his claim is baseless. He makes no claim beyond his absolute right in the stream in common with the public to navigate the water over which the bridge is built. His position is that the bridge is a public nuisance because it is an obstruction to a public navigable stream of water.

Without a pause to examine the right of the plaintiff to maintain this action to repress a nuisance which is common to the public and a wrong against the public only, and, therefore, to be redressed by a prosecution instituted by the State (*Doolittle* v. *The Supervisors of Broome County*, 18 N. Y. 155), we have concluded to examine and decide the appeal upon the merits.

The prolongation of Greenwood lake by the erection of the new dam assumes the character of a private reservoir. Its bed is owned by a private company, and the enlargement of the stream is due to the same cause.

By the common law of England the test of navigability of a stream of water was the ebb and flow of the tide, but that rule never prevailed in this country because it was inapplicable to its condition. We have rivers navigable for thousands of miles and capable of floating the commerce of the world, which are tideless.

By the Roman civil law, rivers in which the flow of water is perennial belonged to the public and were navigable if they were

capable of being navigated in the common-sense meaning of that term.

According to the Digest, a navigable river is *statio iturve navigio.* The Code Napoleon speaks of navigable rivers as *flottables,* that is, rivers admitting floats. (Angell on Tide Waters, 79.)

The rule of the civil law has ever prevailed in the United States, and is another instance of our great obligation to that splendid system of jurisprudence which was developed by the Roman people.

In the State of New York the doctrine of the civil law has been carried to its utmost limit, and the rule to be deduced from the authorities is that all streams are deemed navigable which are capable in their natural state and in their ordinary volume of water of transporting to market the products of the fields, forests and mines.

Because some products may be floated to market as rafts and upon rafts, it is not essential to the public character of the stream that property can be carried in vessels.

As some streams are unnavigable against their current, if they are floatable in their natural state, so as to be of public use with the current, their public character is liberally supported.

Neither is it essential that the floatable capacity must be continuous. If it be ordinarily and subject to fluctuations in volume attributable to natural causes, and occurring with regularity and continuing sufficiently long to make it useful as a highway, it is subject to the public use. These deductions are justified by the following cases : *Shaw* v. *Crawford* (10 Johns. 236); *People* v. *Canal Appraisers* (33 N. Y. 498); *Morgan* v. *King* (35 id. 459); *Pierrepont* v. *Loveless* (72 id. 211); *In re Daniel Ball* (10 Wall. 557); *United States* v. *Burlington & H. Ferry Co.* (21 Fed. Rep. 331).

It will be observed that in all these authorities the words "ordinary condition," "ordinary volume" and "natural state" are used to specify the condition required to constitute navigability. That is, streams must be capable in their natural condition of floating commodities to market.

In the case of *Morgan* v. *King* (*supra*) the court said : "The true rule is that the public have a right of way in every stream which is capable in its natural state and its ordinary volume of water of transporting in a condition fit for market, the products of the forests or mines," etc.

It must be "so far navigable or floatable in its natural state and its ordinary capacity as to be of public use in the transportation of property."

The stream in question in its natural state answered none of the requisites of the law to render it navigable. In its ordinary condition it would float nothing of importance.

We have seen that a stream may be subject to a public use if it be ordinarily subject to periodical fluctuations in volume and height which occur with regularity, but this stream meets none of these requirements.

Its augmentation was caused by artificial means by a private company, and it may be reduced to its original condition at any time at the volition of the company, subject to no public control.

Sir MATTHEW HALE, in his celebrated treatise De Jure Maris, says: "There be streams or rivers that are private, not only in property or ownership, but also in use, as little streams and rivers that are not a common passage for the King's people. Again, there be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters, and these, whether they are fresh or salt, whether they flow and reflow or not, are *prima facie publici juris* common highways for man or goods or both, from one inland town to another."

In the case of *Ledyard* v. *Ten Eyck* (36 Barb. 124) the judge who prepared the prevailing opinion of the court, in speaking of Cazenovia lake, said : " This lake is about five miles long and three-fourths of a mile wide, has no current and no main inlet. The land lying along its shores is mostly improved and used as farming land. Elegant mansions have been erected, and the region of country is healthy and beautiful. But this lake, in my judgment, is in no legal or just sense of the term navigable water. It is not, in the language of Lord HALE, a highway ' for man or goods or both, from one inland town to another.' "

These remarks apply with equal force to Greenwood lake.

An extensive and thorough examination has failed to disclose either principle or authority for holding the stream in question a public navigable stream of water.

It is distinguishable in no way from the numerous small meandering streams throughout this State which find their way into rivers.

·and lakes, but which are entirely useless for any practical purpose of floatage.

The order should be reversed, with ten dollars costs and disbursements, and the motion denied, with ten dollars costs.

Cullen and Pratt, JJ., concurred. ·

Order reversed, with ten dollars costs and disbursements, and motion denied with ten dollars costs.