# THE MAYOR AND CITY COUNCIL OF HAVRE DE GRACE, MARYLAND,

*vs.*

## JAMES H. HARLOW and FRANK J. HOEN.

*Injunctions: public nuisances; private or municipal complainants; must show special injury; fishing in Susquehanna River. Havre de Grace: no special or exclusive right. Navigable waters: what are? Susquehanna Dam: Chapter 268 of Acts of 1908; no ground for injunction. Legislative charters: easements; ratification or repeal. Compensation.*

Neither an individual nor a municipal corporation may enjoin that which is done under the authority of express legislative grant.                              p. 268

In order to obtain an injunction against the erection of what is anticipated may become a public nuisance, it must appear that some injury will be sustained, or reasonably be anticipated, on the part of the complainant other and different in kind from that to which the public at large is or will be subjected.                              p. 269

Chapter 268 of the Acts of 1908, giving the right to build a dam across the Susquehanna River, contravenes no express principle of the Constitution.                    pp. 269-270, 271

The fact that many inhabitants of Havre de Grace had for many years been engaged in the occupation of catching fish in the Susquehanna River gave neither to the inhabitants of the municipality, nor to the municipality itself, any special interest in such fisheries different from that of others who might be so engaged; and gives them no such interest as to sustain the issuance of an injunction to prevent interference with such catching of fish.                              p. 269

The navigability of one part of a stream does not of itself render the entire stream navigable throughout its full length.
                                        p. 271

A navigable stream may, from a variety of causes, become non-navigable, and conversely.                    p. 272

At common law, navigable waters were held to be those affected by the ebb and flow of the tide.                 p. 272

A mere declaration, even by statutory authority, that a stream is navigable does not make it so.                   p. 272

In the United States, to constitute a navigable stream, the navigability need not be perennial.                  p. 272

A stream, even above tidewater, is deemed navigable if of sufficient capacity to float to market the products of the mine, the forests, or the tillage of the country through which it flows.
pp. 272-273

A dam built across the Susquehanna River under the authority of Chapter 268 of the Acts of 1908, is not such an obstruction to the navigable character of the river as to warrant the issuing of an injunction to prevent its construction.       p. 278

Whether the plans filed by the defendant did or did not show provision for chutes or locks as required by the Act of 1908, was, *Held,* that there was no sufficient cause shown to authorize the Court to retain the bill, so as to have jurisdiction over the defendant, since the power remained with the Legislature to compel compliance at any time.                      p. 278

While Chapter 268 of the Acts of 1908, granting to the Susquehanna Power Company, its successors and assigns, the right to construct a dam across the Susquehanna River, is an easement granted, not in perpetuity, but during the pleasure of the Legislature in the exercise of its discretion; but if the right be annulled or materially altered, it is to be compensated for, to the extent that the grantee of the easement has, in good faith and reliance thereon, made expenditures upon the same.
p. 277

*Decided June 23rd, 1916.*

Appeal from the Circuit Court for Harford County. In Equity. (HARLAN, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Urner, Stockbridge and Constable, JJ.

*Thos. H. Robinson* (with whom was *F. Lee Coburn* on the brief), for appellant.

*Stevenson A. Williams* (with whom were *Fredk. R. Williams* and *Geo. R. Willis* on the brief), for the appellees.

Stockbridge, J., delivered the opinion of the Court.

The Mayor and City Council of Havre de Grace filed the bill in this case to prevent, by means of injunction, the building of a dam or dams across the Susquehanna River by James H. Harlow and Frank J. Hoen, upon the theory that the construction of such dam or dams would be in the nature of a public nuisance which the City might invoke the arm of the law to restrain. The nature of the particular injury done to the plaintiff as a municipal corporation was two-fold: first, that by the erection of such an obstruction the fishing industry of the municipality would be seriously injured; and, secondly, that such obstruction would destroy the navigable nature of the Susquehanna River, and thereby render unprofitable and perhaps valueless certain wharf property owned by the municipality.

At the argument, it was urged that the river was an artery of commerce, and as such that, whether such commerce was interstate or intrastate, it rested in control of the national government rather than of the State. To this it was replied that the question of exclusive federal jurisdiction was not raised before the trial Court, and therefore that under the provision of section 9 of Article V of the Code of Public General Laws the matter was not one open for the consideration of this Court on appeal. Prior to the adoption of the Act of March 3, 1899 (section 10 of Chapter 425 [Vol. 30 Statutes at Large] of the Act of the 55th Congress), the rule

was that laid down in such cases as *Cardwell* v. *American River Bridge Company,* 19th Fed. 562, and *Escanaba & L. M. Transp. Co.* v. *Chicago,* 107 U. S. 678, that "The power of Congress to control the internal navigable waters of the states under the authority to regulate commerce is exclusive when exercised; but, until Congress acts the Legislature of any State has the power to authorize the obstruction of any navigable waters within its borders by the erection of bridges, dams or other structures for the convenience and advantage of commercial intercourse."

By the Act referred to it was provided: "That the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States is hereby prohibited." The record in this case does not disclose that there has been any affirmative action by Congress; the most that it shows is that on two occasions reports have been made to the Secretary of War reaching directly opposite conclusions as to the navigability of the Susquehanna River, but it is not necessary in this case for this Court to pass upon the federal question. That will more properly be raised in an entirely different tribunal. So far as the present case is concerned, this Court is necessarily controlled by other considerations.

As to the right of the appellant to maintain the suit at all, there may be a serious question. It has been held in a long line of cases that the private individual may not enjoin that which is done under the authority of express legislative sanction, and since a municipal corporation derives its powers from a legislative grant, it is not easy to logically establish a proposition that because the Legislature has chartered a municipal corporation, such creature of the State is invested with any power to enjoin the doing of an act the right to do which is expressly conferred by the same authority from which the municipal body derives its existence, and of subsequent date. But even if this were not true, the fact remains that to enjoin the erection of that which it is antici-

pated will or may become a public nuisance, there must be upon the part of the plaintiff some injury sustained, or reasonably to be anticipated, other and different in kind from that to which the public at large is subjected. *B. & O. R. R. v. Gilmor,* 125 Md. 610.

The citizens of Havre de Grace, and the municipality, if it can be assumed that the municipality represents them, has no monopoly in the rights of fishery and navigation. These are common rights to which all citizens of the State are entitled. They are rights enjoyed by all in the navigable waters of a stream, and to a more limited extent in non-navigable waters. The evidence shows without contradiction that for many years shad fishing was an important industry of the City of Havre de Grace, giving employment during the season to several hundred persons, but it also shows that that industry has dwindled to comparatively insignificant proportions, and this diminution is shown to be due, not to the erection of a dam or dams across the Susquehanna River, but because by reason of nets stretched below the City of Havre de Grace, the fish have been arrested and caught before reaching that point on their way to their spawning grounds in the upper portions or branches of the river. The witnesses who were examined upon this aspect of the case all spoke of the proposed dam as being an obstruction to the fish, unless fishways were provided in the dam to be erected. But the Act of 1908, Chapter 268, now in question, provides in express terms in section 6:

> "That in every such dam so constructed by said Company the said Company shall construct and maintain sufficient fishways or ladders to permit the passage of fish from the waters below to the waters above any such dams."

This is an express limitation upon the character of the structures to be erected, and one which the State through its proper officers should require the Susquehanna Power Company to fully comply with, and such being the case this

ground for maintaining the bill of the plaintiff can not be sustained.

The constitutionality of the Act is mainly attacked upon the ground that it is an illegal authorization of the obstruction to commerce upon the river. To satisfactorily deal with the question thus presented it is necessary to understand exactly what the legislation, both as affecting this company and as defining the rights of the public in the Susquehanna, has been.

In 1883 the Susquehanna Water Power and Paper Company of Harford County was chartered under the general incorporation law. The powers set forth in its certificate of incorporation were further enlarged by the Act of 1884, Ch. 85. Then followed the Act of 1900, Ch. 248. A dam had been built at that time across the river, and the Act of 1900 recognized the Susquehanna Power and Paper Company as the owner of that dam. It did not, however, contain any grant of power for the erection of a dam across the river below the one already constructed.

By an Act of the Legislature of 1797, Chapter 99, it had been declared that: "The bed of the river Susquehanna from the Maryland line to the tidewater, shall be considered a public highway, free for any person or persons whatsoever to work thereon in clearing the obstructions to its navigation."

By the Act of 1813, Chapter 116, it was provided: "In consideration of the Act of the Legislature of Pennsylvania, passed February 19, 1801, that the bed of the river Susquehanna from the Maryland line to the Bay of the Chesapeake, is hereby declared, and shall forever hereafter, be a public highway, and that individuals or bodies corporate may at all times remove obstructions in its navigation."

Both of these Acts reserved certain rights to the proprietors who were said, in an Act of 1783, Chapter 23 (November session), to "have undertaken to render the river Susquehanna navigable from the line of this State to tidewater."

To militate against declarations such as these, and so as to operate pro tanto as a repeal of them, a subsequent Act of the Legislature must be clear and definite, and it does not appear that this element was sufficiently present in the Act of 1900 to have that effect.

When now we come to the Act of 1908 we find an express grant of power in section 3: "To locate and build in, along or across the said river and the bed and shores thereof, and the canals, railroads, ferries and highways thereon, there along or leading thereto, any dam or dams the crest or crests of which shall not exceed an elevation of one hundred and ten feet above mean low tide at Havre de Grace, said dam or dams to be located at any point between tidewater and Mason and Dixon's line."

Power is also given to acquire land by purchase or condemnation for the construction of said dam or dams, and "to cut, re-cut or enlarge canals along the shores of said river, with dimensions commensurate with the beam, displacement, tonnage and motive power of all vessels which shall navigate the back-water formed by its said dam or dams,"

This Act, therefore, differs from the antecedent act in that it establishes a maximum height for any dam or dams to be built, and also territorial limits within which their construction may be had. Such were some of the franchises which were mortgaged by the Susquehanna Power Company to the Girard Trust Company, and upon the foreclosure of which mortgage passed to the appellees.

It will be apparent that no provision of this Act is in contravention of any expressed principle in the Constitution and that the relief now sought can be granted only in case it amounts to the destruction of an inalienable right of the public.

In dealing with navigable waters some matters may be regarded as axiomatic; thus, a stream may be navigable in part and non-navigable in part, and the navigability of one

part does not of itself render the entire stream throughout the full length of its course a navigable stream; also, a stream which is non-navigable may be made navigable by the removal of those things which constitute obstructions to its navigability; and conversely, a stream navigable at one time may as the result of any one or more of a variety of causes become thereafter non-navigable.

Under the English common law navigable waters were held to be those in which the tide ebbs and flows—this fact was made the test of navigability. By the Roman law rivers in which the flow of water is perennial were held to belong to the public, and they were navigable if they were capable of being navigated, in the ordinary sense of that word. The Code Napoleon speaks of navigable rivers as "floatable," that is rivers admitting floats.

The rule of the civil law is the one which has prevailed in this country; *Ten Eyck* v. *Warwick*, 75 Hun. 562; *Ingraham* v. *Wilkinson*, 21 Mass. 268; *Stuart* v. *Clark's Lessee*, 32 Tenn. 9.

A mere declaration, though by statutory authority, that a stream is navigable, could not make it so unless it was navigable in fact; 29 *Cyc.* 293. And it has also been held in this country, in derogation of the civil law rule, that to constitute a navigable stream, it need not be perennially so, but the seasons of navigation must occur regularly, and be of sufficient duration and character to subserve a useful purpose for commercial enterprises. See cases cited in 20. *Cyc.* 292. Or, as it has been expressed in some of the cases, the test of navigability is navigable capacity without regard to the character of the craft, the business done, the ease of navigation, the surroundings of the stream, or whether it connects with another stream or highway, or flows into a private estate; *State* v. *Pac. Guano Co.*, 22 S. C. 50; *Heyward* v. *Farmer Min. Co.*, 42 S. C. 138; *Bucki* v. *Cone*, 25 Fla. 1.

And, again, any stream though above tidewater, is a navigable water if of sufficient capacity to float the products of

the mine, the forests or the tillage of the country through which they float to market; *Lewis* v. *Coffee County,* 77 Ala. 190; *Burk County Commrs.* v. *Catawba Lumber Co.,* 116 N. C. 731; *Little Rock M. & T. R. R. Co.* v. *Brooks,* 39 Ark 403.

The doctrine of the civil law has been carried to its utmost limit in the United States, and the rule frequently laid down is, that all streams are to be deemed navigable which are capable *in their natural state* and in their ordinary volume of water to transport to market the products of the fields, forests and mines; *Ten Eyck* v. *Warwick,* 75 Hun. 562. But "it is not enough that a stream is capable during a period in the aggregate of from two to four weeks in the year when it is swollen by the spring and autumn freshets of carrying down its rapid course whatever may have been thrown upon its angry waters to be borne at random over every impediment in the shape of dams or bridges which the hand of man has erected. To call such a stream navigable in any sense is a palpable misapplication of the term." *Munson* v. *Hungerford,* 6 Barb. 265. And in *Bayzer* v. *McMillan Mill Co.,* 105 Ala. 395, it was said: "Where the evidence shows that the stream is only capable of being used for floating of logs for a short period during the spring and winter freshets, and there is no evidence concerning the character of the forests adjacent thereto, or the number of people engaged in the logging business, or that boats had ever navigated its waters, the stream as a matter of law is not a public stream."

In the *Daniel Ball,* 10 Wallace, 557, FIELD, J., said: "Those rivers must be regarded as public, navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used or are susceptible of being used in their ordinary condition as highways for commerce over which trade or travel are or may be conducted in the customary modes of trade or travel on water."

Citations might be multiplied almost indefinitely of what constitutes navigable waters, and they are very far from being in harmony when applied to a particular case. They will be found very fully collected in 5 *Words and Phrases,* beginning on page 4676; 3 *Words and Phrases,* 2nd series, page 527; and in an extremely full and valuable note in *Hutton* v. *Webb,* 59 L. R. A., beginning on page 33.

The best solution to the conflicting views which the courts have adopted is to be found in the suggestion contained in *Moore* v. *Sanborne,* 2 Mich. 519, "that the servitude of public interests depends rather on the purpose for which the public requires the use of the stream rather than any particular mode of use."

In many of the cases there has been a disposition to apply as the test of navigability the fact whether the stream in question was or was not navigable in its natural state, and with its ordinary volume of water, for the purposes of transportation. If that test were to be applied in this case, this Court would be compelled to hold the Susquehanna River to be non-navigable, even within the State of Maryland, as in the earliest of the Acts reference is made to the obstructions in the river, and to rights granted to individuals and corporations to remove obstructions and to the Proprietors to obviate such obstructions by the means of building canals.

But in the last analysis what constitutes a navigable river free to the public is a question of fact to be determined by the natural conditions in each case; *American River Water Co.* v. *Amsden,* 6 Cal. 443; *Brown* v. *Chadbourne,* 31 Me. 9; 29 *Cyc.* 293; *The Montello,* 20 Wallace, 430. Where legislative permission to construct a dam across a navigable stream has been granted it gives a right which can not be destroyed by the declaration of a municipal corporation that the dam is a public nuisance; *Clark* v. *Syracuse,* 13 Barb. 32; and in *Morgan* v. *King,* 18 Barb. 277, it was held, that the Legislature may authorize the erection of dams in navigable rivers, and prescribe the mode in which those author-

ized shall be built. Every dam is in a sense an obstruction
to navigation, but that fact, even though it be in a navigable
river, does not constitute it a nuisance when authorized by
law; *Ensworth* v. *Commonwealth*, 52 Penn. 320.

What now shall be said of the Susquehanna River, above
tidewater, as a navigable stream? It has already been noted
that in the very Act which declared it to be a public high-
way permission was given to individuals or corporations to
remove obstructions in the river, and that certain rights were
reserved to a company which had undertaken, by the con-
struction of a canal, to render the river more practically
navigable. There is no pretense or claim in this case that
the Susquehanna is or ever was in its natural state navigable
for upstream commerce between the head of the tidewater
and the Pennsylvania line.

The downstream navigation seems to have been of two
classes—canal boats, which had been built further up the
stream, which were too wide to admit of their passage through
the locks of the canals, and which were brought down un-
loaded, to be taken for use upon the Erie and other canals;
secondly, arks or rafts, which were made of logs or lumber,
and which, though drawing at the most between three and
four feet of water, could not be brought down when the river
was in its normal state of flow, but only at the times of flood,
when the water was about four feet above its normal height.
The season for these seems to have been approximately two
months in the spring of the year, though in one exceptional
season there is evidence tending to show that they came down
during every month of the year. Occasionally these rafts
bore upon them some slight loads, consisting of potatoes,
which were sold to those living along the river's banks, a
little pig iron, on one occasion a barrel of whiskey, and on
another certain family furniture. These loads did not, how-
ever, constitute the important traffic upon the river. That
was the bringing down of the logs, most of which appear to
have been disposed of at saw mills along the way, while some

after reaching tidewater were rafted for the lumber market of New York, Philadelphia and Baltimore. A half century and more ago this lumber traffic upon the river is testified to have been very considerable in volume, but that it has gradually and steadily fallen off, and that the last of the commerce of this character to come down the river was fifteen years ago. The extinction of this commerce was due, however, not to the erection of bridges or dams across the river, but to entirely different causes, viz, the formation of considerable bars at the mouths of some of the creeks emptying into the river, thus forming natural obstacles to its navigation, and more especially to the fact that the merchantable lumber upon the upper reaches of the river had been cut off for a distance of approximately thirteen miles back from the stream, so that the cost of hauling to the river was as great, if not actually greater, than the cost of its transportation by rail. It was owing to causes such as these that the year 1902 witnessed but two rafts coming down the river, where theretofore in the fifties and sixties of the last century, they had been numbered by the hundreds.

In the meantime a number of dams had been thrown across the river in the State of Pennsylvania, under the sanction of a General Act passed in 1803, but even though the only commerce upon the river consisted in the floating of the logs down stream, such limited use has generally been held not to destroy the navigable character of a river. *Lamprey* v. *State,* 52 Minn. 181; *Olson* v. *Merrill,* 42 Wis. 204; *Bucki* v. *Cone,* 25 Fla. 1; *Burk County Commrs.* v. *Catawba Lumber Co.,* 116 N. C. 731; *Falls Mnfg. Co.* v. *Oconto River Improvement Co.,* 87 Wis. 134; *In Re So. Wis. Power Co.,* 140 Wis. 245, and in *Hallock* v. *Suitor,* 37 Or. 9, it was held that a stream capable of floating logs and timber to market is not deprived of its navigable character by the fact that for a portion of the year it can not be used for that purpose. See also, *Thunder Bay Co.* v. *Speechly,* 31 Mich. 336. But any water to be navigable must be susceptible of use for purposes

of commerce, or possess the capacity for valuable floatage, in transporting to market the products of the country through which it runs, and it must be of practicable usefulness to the public as a public highway in its own State, and without the aid of artificial means; a theoretical or potential navigability or one that is temporary, precarious and unprofitable is not sufficient. *Hurst* v. *Dana,* 86 Kan. 947. In this connection it is important to note that the mere damming of a river, if it has capacity to float boats used as instrumentality to commerce, does not destroy its navigability, but that such rivers still remain highways for common use. *Broadnax* v. *Baker,* 94 N. C. 675; where the principle was applied in the case of a river intercepted by falls. The nature of the right granted has sometimes been called a revocable license. *Sus. Canal Co.* v. *Wright,* 9 W. & S. 9; *N. Y. & Erie R. R. Co.* v. *Young,* 33 Penn. 175. It is perfectly true that under the Constitution of this State and the reservation contained in the Act of 1908, the right is liable to modification, amendment or repeal, wherever in the judgment of the Legislature its exercise amounts to a serious obstruction to or destruction of the navigation of the river. The Act, however, is a grant of a right to the Susquehanna Power Co., its successors and assigns, and is most properly described as an easement granted, not in perpetuity, but during the pleasure of the Legislature in an exercise of its discretion, and, therefore, if annulled or materially altered to be compensated for to the extent to which the grantee of the easement has in good faith and reliance thereon made expenditures. *Lake Roland El. Ry. Co.* v. *Baltimore City,* 77 Md. 352; *Anne Arundel Co.* v. *United Rys. Co.,* 109 Md. 377.

The effect of these dams will necessarily be to cause pools of back water to be formed, across which some ferry boats may be operated; but it has more than once been held that the operation of a ferry across a stream does not constitute such stream a navigable water throughout its length; nor do pleasure boats, whether row boats or power launches, operated on

such slack water constitute commerce within the meaning of that term, as applied to navigable streams. *Baldwin* v. *Erie Shooting Club,* 127 Mich. 659; *Harrison* v. *Fite,* 148 Fed. 781; *People* v. *Economy L. & P. Co.,* 241 Ill. 290.

After a full consideration of the facts as testified to in this case, and a careful examination of the Act of 1908, this Court is of opinion that the proposed dams, if constructed in accordance with the requirements of the Act, are not such obstructions to the navigable character of the river as to warrant the granting of the injunction sought by the bill. It is true that the Act of 1908 does not in terms require that the dam or dams to be constructed under its provisions shall be equipped with chutes or have locks constructed by means of which they may be passed by boats or rafts in either direction. The plans for the dams, as detailed by the appellees in their testimony, indicate a purpose upon their part to include such provision, but whether they do or not, by reason of the nature of the grant given, it remains within the power of the Legislature and the State whenever it shall deem it necessary for the purposes of navigable commerce to require such provision to be made. There can, therefore, be no sufficient reason for adopting the suggestion of the appellant, that even though the structures now proposed to be erected should be of a lawful nature, nevertheless the bill ought to be retained in order that the Court might have jurisdiction over the appellee.

The decree appealed from will accordingly be affirmed.

*Decree affirmed, with costs.*